M. WEINGOLD & COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent NATHAN TRUGMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
M. Weingold & Co. v. Commissioner
Docket Nos. 4824-74, 7168-74.
United States Tax Court
T.C. Memo 1977-73; 1977 Tax Ct. Memo LEXIS 371; 36 T.C.M. (CCH) 329; T.C.M. (RIA) 770073; March 21, 1977, Filed Bennet Kleinman and Laurence Glazer, for the petitioner in docket No. 4824-74. Richard Katcher and Kenneth F. Snyder, for the petitioner in docket No. 7168-74. John P. Graham, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Taxable Year
Ended
Deficiency
M. Weingold & Company
12-31-69
$5,280.00
12-31-70
9,840.00
12-31-71
9,600.00
12-31-72
9,600.00
Nathan Trugman
12-31-69
10,421.40
12-31-70
18,136.55
12-31-71
613.74
*372 The only issue presented for our decision is whether the value placed on a covenant not to compete by written provision in the contract of sale of Nathan Trugman's scrap metal business to M. Weingold and Company should be upheld and recognized for tax purposes. The petitioners' respective positions regarding the transaction are antithetical. Respondent has taken inconsistent positions. In the Weingold case he determined that the payments to Nathan Trugman represent the cost of acquiring the goodwill of the business formerly conducted by Trugman. In the Trugman case he determined that there was a sale of a covenant not to compete. As a stakeholder in these consolidated cases, respondent does not seek to sustain the deficiencies as to both parties. However, after trial and on brief the respondent takes the view that Trugman received ordinary income to the extent allocated in the contract of sale to the noncompetition covenant. FINDINGS OF FACT Some of the facts have been stipulated by the parties and such facts are found accordingly. M. Weingold and Company (hereinafter referred to as Weingold Company) is a corporation organized under the laws of Ohio whose principal *373 place of business on the date the petition herein was filed was located at 3920 East 91st Street, Cleveland, Ohio. Weingold Company filed its Federal corporation income tax returns with the District Director of Internal Revenue, Cleveland, Ohio, for each of the taxable years 1969, 1970, 1971, and 1972. Nathan Trugman (hereinafter sometimes referred to as Trugman) is an individual whose legal residence at the time the petition herein was filed was 12000 Fairhill Road, Cleveland, Ohio. He filed his Federal income tax returns with the Internal Revenue Service Center, Cincinnati, Ohio, for each of the taxable years 1969, 1970, and 1971. Weingold Company was organized as a family business in 1912. From the time of its inception Weingold Company has been in the scrap iron and metal business in Cleveland, Ohio. Ninety percent of its business involves purchasing scrap metals from industrial customers. Empty container boxes are placed at customers' plants where they are subsequently picked up with a load of scrap, and an empty container box is then substituted for each loaded container. Jack Weingold (hereinafter referred to as Weingold) has been vice-president of Weingold Company *374 since about 1962. Nathan Trugman attended high school in Newark, New Jersey. He had no further formal education. After World War II he operated a furniture business in Lakewood, Ohio, for three years. That business closed due to financial reverses. Later, Trugman was employed as an appliance salesman for a Cleveland department store. Around this time, he was asked by a friend to work with him in the scrap business and trucking business. For a while Trugman held two jobs--one in his own scrap metal business and the other as an employee of Thompson Products--until he decided to devote all of his time and effort to the scrap metal business. Trugman established his scrap metal business in 1953 and conducted it in sole proprietorship form under the names of Supreme Salvage Company and Supreme Smelting Company (both of which are hereinafter referred to as Supreme). His scrap iron and metal business was conducted from business premises located at 5002 Holyoke Avenue, Cleveland, Ohio. Supreme's business originally involved removing furnaces or boilers from commercial or residential property and reselling scrap cast iron or sheet iron to foundries. In 1960, however, Supreme began *375 to purchase other types of scrap material and leased a yard so that customers could bring their scrap metal to his place of business. In 1965 Supreme had between 25 and 30 pickup accounts which required that Trugman or one of his two helpers go to a customer's place of business to pick up scrap and bring it back to Supreme's yard for sorting and processing before resale to foundries. Prior to 1966, Trugman had rarely solicited accounts. In 1966, however, Supreme employed a salesman, Donald Ettkin (hereinafter referred to as Ettkin), for the purpose of soliciting customers. By June 1969 Supreme had over 150 pickup accounts primarily as the result of Ettkin's efforts. During the period after Ettkin was employed, Trugman's responsibilities involved office work, telephone contacts with customers, and the reception, inspection, and segregation of materials which were delivered to Supreme's yard. During the period 1965 through 1969 Trugman had some problems with his health. He had a gall bladder operation in 1968 and was readmitted for gall bladder surgery in 1970. Due largely to the success of Supreme's salesman, Ettkin, the nature of Supreme's business changed and the volume *376 of its sales increased substantially. Because Supreme was dealing primarily with industrial type scrap, Supreme purchased two load-lugger trucks and about 60 load-lugger boxes which were used to store scrap metals and to haul scrap materials to and from its yard. This change in Trugman's business brought it into direct competition with the Weingold Company since both businesses occasionally sought the same customers. By June 1969 competition between Supreme and Weingold Company had become so severe that Weingold Company on June 10, 1969, filed a lawsuit in the Court of Common Pleas, Cuyahoga County, Ohio, Case No. 875019, against Supreme, Trugman, and Ettkin. The suit alleged that Ettkin had called upon customers of Weingold Company for purposes of slandering it in order to take away its accounts. The suit asked for compensatory damages of $75,000, punitive damages of $1,000,000, and injunctive relief. Shortly after Weingold Company filed the lawsuit against him, Trugman met with Jack Weingold on or about June 15, 1969. At that meeting Weingold inquired as to whether Trugman was interested in selling his business to the Weingold Company. He asked Trugman to give his proposition *377 some thought but Trugman did not respond. A few days later Weingold again met with Trugman to discuss the possible sale of Trugman's business. During the course of negotiations Trugman stated that his business operations generated less than $25,000 of net income annually. However, he never showed Weingold any of his financial statements or tax returns. Schedule C attached to Trugman's Federal income tax returns for each of the calendar years 1965 through 1969 reported net profit from the operation of his business as follows: Year
Amount
1965
$ 13,944.14
1966
14,912.47
1967
14,124.03
1968
15,519.61
1969
10,254.04 At the second meeting, Weingold offered to purchase Trugman's business for $140,000. When that offer was not accepted, Weingold increased his offer to $150,000. Finally, Trugman accepted Weingold's third offer of $160,000 for his business. Weingold's primary purpose in purchasing Trugman's business was to get Trugman out of the scrap metal business for competitive reasons. After Trugman decided to sell his scrap metal business, he telephoned his attorney, Nelson A. Moss (hereinafter sometimes referred to as Moss). Trugman advised Moss *378 that he had agreed to sell his business to the Weingold Company for $160,000 and that the lawsuit which Weingold Company had brought against him, Supreme, and Ettkin would be dismissed. When Trugman advised Moss that he had agreed to sell his business to Weingold Company for $160,000, there was no discussion between Trugman and Moss about any covenant not to compete. During that conversation with his attorney, Trugman inquired as to the tax consequences of selling his scrap metal business to Weingold Company for $160,000. Moss advised Trugman at that time that the sale of his entire business would result in long-term capital gain. Alan Berman (hereinafter sometimes referred to as Berman), the attorney representing Weingold Company, telephoned Moss, the attorney representing Trugman, and told him that a sale was going to take place and that he wanted to work out the terms of the written contract of sale with him. Moss, Berman, and an office associate of Berman met for about two hours on June 20, 1969, in connection with working out the detailed terms of the proposed sale of Trugman's scrap metal business to the Weingold Company. Berman then prepared a draft of the agreement of *379 sale and included in it an allocation of the $160,000 to various assets being purchased from Trugman, including an allocation of $100,000 to a covenant not to compete. Moss closely examined the draft of the proposed agreement and made notes thereon. On review of the draft, Moss wrote the phrase "don't like" next to paragraph 3 which contained the allocation of the purchase price among the various assets including the covenant not to compete. Moss advised Trugman of every detail which transpired during meetings between counsel for both petitioners. On June 25, 1969, Weingold Company entered into a written agreement with Nathan Trugman. The June 25, 1969, written agreement was for the purchase and sale of Trugman's scrap business and provided in pertinent part as follows: AGREEMENT
THIS AGREEMENT made and concluded at Cleveland, Ohio, this 25th day of June, 1969, by and between NATHAN TRUGMAN dba SUPREME SALVAGE COMPANY and SUPREME SMELTING COMPANY ("SELLER") and M. WEINGOLD & COMPANY, an Ohio corporation, ("PURCHASER"). RECITALS: Seller owns and operates as a sole proprietorship a ferrous and non-ferrous scrap metal business ("business") under the names of Supreme *380 Salvage Company and Supreme Smelting Company; and Seller desires to sell his business and certain assets of the business to Purchaser. The assets to be sold by Seller to Purchaser hereunder consist of trucks and trailers, metal boxes used for collecting scrap, a list of Seller's current customers and Seller's cooperation in assisting Purchaser in obtaining said customers for its own account and Seller's non-competition agreement. IT IS THEREFORE AGREED: 1. SALE OF BUSINESS. The Seller hereby sells to the Purchaser and Purchaser hereby purchases from Seller the scrap metal business owned and operated by the Seller as a going concern, including some of the equipment used in the business, all existing accounts, a customer list, and use of the names Supreme Salvage Company and Supreme Smelting Company, all as more fully described as follows: * * *
3. PURCHASE PRICE. Purchaser hereby agrees to pay to Seller and Seller hereby agrees to accept in full payment from Purchaser the following amounts: (a) Equipment
$50,000.00
(b) Accounts, Customer Lists,
Use of Names and Good Will
10,000.00
(c) Non-Competition Agreement
of Seller
100,000.00
TOTAL
$160,000.00
*381 The total purchase price of One Hundred Sixty Thousand Dollars ($160,000.00) shall be payable as provided in Section 4 of this Agreement. 4.PAYMENT OF PURCHASE PRICE. The total purchase price of One Hundred Sixty Thousand Dollars ($160,000.00) shall be payable as follows: (a) The sum of Forty-Four Thousand Dollars ($44,000.00) in cash at the closing. (b) The balance of One Hundred Sixteen Thousand Dollars ($116,000.00) in twelve (12) equal quarterly installments of Nine Thousand Six Hundred Sixty-Six and 66/100 Dollars ($9,666.66), together with interest accrued to date of installment on the principal balance thereof at the rate of Seven Per Cent (7%) per annum, with the first quarterly installment due January 15, 1970, and each successive three (3) months thereafter, on the 15th day of such month, until fully paid, together with interest as aforesaid. The Purchaser shall have no right to prepay any part of the balance of the purchase price, on or before January 1, 1970. Thereafter, Purchaser shall have the right to prepay without penalty any portion or all of the balance of the purchase price at any time prior to maturity. * * * *
6. NON-COMPETITION AGREEMENT *382 OF SELLER. For a period of five (5) years from the date hereof, the Seller shall not: (a) Engage in or participate with, directly or indirectly, either as an owner, employee, agent, stockholder, partner, advisor or in any other capacity whatsoever, in the scrap metal business in the following counties in Northeastern Ohio: Cuyahoga, Lake, Geauga, Summit, Lorain, Medina or Portage: (b) Make available to any person or firm any list or lists of its customers and accounts or prospective customers or accounts, or any information whatsoever concerning said customers and accounts relating to the scrap metal business; or (c) Do anything that will in any way directly or indirectly divert, take away or attempt to take away any of the customers, accounts or patronage of Purchaser, whether it be from the accounts which Purchaser is buying hereunder or accounts which Purchaser had prior to the date of this transaction or which Purchaser acquires in the future during said five-year period; or (d) Prevent or attempt to prevent the continued employment by Purchaser of one Donald Ettkin who formerly was employed by Seller as his account representative. The parties agree that if Seller *383 violates any of the covenants set forth in this non-competition provision, the Purchaser shall be entitled to any and all injunctive relief in any court of competent jurisdiction, in addition to an action for damages. * * *
8. DISMISSAL OF LAWSUIT BY PURCHASER. Within three (3) days of the closing, Purchaser shall cause a certain action against Seller and others, pending in Case No. 875019 of the Cuyahoga County Common Pleas Court, to be: "Dismissed With Prejudice at Plaintiff's Cost". Purchaser hereby releases and discharges Seller and the other parties named in said lawsuit from all claims which Purchaser may have against Seller and others for the events described in the Petition filed in said lawsuit. * * *
At the time of the closing of the transaction, Trugman asked his lawyer, Moss, to explain the significance of the covenant not to compete. Moss' response was that Trugman was selling his entire business and that the allocation of the purchase price to certain assets was not significant taxwise to Trugman. Moss advised Trugman to the effect that where an individual owns a business for more than six months, he will have a long-term capital gain on the sale *384 of that business; and that installment sale treatment may be had if in the taxable year of the sale the payments do not exceed 30 percent of the selling price. Upon this advice, and only after reading the entire agreement, Trugman signed the written agreement dated June 25, 1969, for the sale of his scrap metal business to Weingold Company. On the date of the sale of his business Trugman had about 150 accounts and customers.Trugman gave Weingold Company a list of these accounts pursuant to their written agreement. The name, address, and the contact man for each account, as well as the telephone number, the dates of sales, and the amount and type of materials sold were listed on cards which Trugman turned over to Weingold Company. At the time the business was sold to Weingold Company, the load-lugger trucks and boxes had the names in decal form of either Supreme Salvage Company or Supreme Smelting Company and Trugman's telephone number on them. These decals were not removed by Trugman prior to the sale. A supplement to the agreement of sale provided that Weingold Company had the right to use Supreme's telephone number. After the sale, Weingold did not ask Trugman to visit *385 any of his former customers whose accounts were sold to Weingold Company. After one week, although the purchase agreement provided for Trugman's services for two weeks, Weingold told him that his services were no longer necessary. Prior to the sale of Supreme to Weingold Company, Trugman had never participated in the purchase or sale of a business. He was represented in the sales transaction by Moss, a sole practitioner whose law practice primarily involved real estate and mortgage transactions. Most of the tax returns which Moss prepared consisted of returns for wage earners. He had never prepared a corporate tax return and had prepared business returns for Trugman and only one other individual. Weingold Company paid Trugman the following amounts in the calendar years indicated below, pursuant to the June 25, 1969, agreement: Amount Paid by Weingold Co. to Year
Trugman
1969
$44,000.00
1970
95,333.32
1971
20,166.63
Trugman's Federal income tax return for 1969 reflects the sale of his scrap metal business, including equipment and good will, on June 30, 1969, for $160,000, with his basis shown thereon as $48,491 and depreciation taken thereon of *386 $8,951.82. Weingold Company claimed the following deductions as "non-compete agreement expense" on its Federal income tax returns for the years indicated: Year
Amount of Claimed Deduction
1969
$10,000
1970
20,000
1971
20,000
1972
20,000
Trugman first became aware that the $100,000 allocated in the contract to the covenant not to compete was going to be treated as ordinary income rather than capital gain, as he was told by Moss, when notified by the Internal Revenue Service. Trugman went back into the scrap metal business, although on a smaller scale, five years and four months after he signed the agreement of June 25, 1969.
OPINION The question before us in this proceeding is whether the allocation of part of the purchase price of a business to a covenant not to compete specifically made in a contract of sale should be recognized for tax purposes, or whether the covenant is a non-severable part of the goodwill transferred so that the allocation to the covenant should be ignored. The determination as to whether a covenant not to compete was actually bargained for is important, from a tax standpoint, to both the buyer and the seller. This is so *387 because the amount a buyer pays a seller for such a covenant, entered into in connection with the sale of a business, is ordinary income to the covenantor and an amortizable item for the covenantee. Commissioner v. Danielson,378 F. 2d 771 (3rd Cir. 1967), sec. 1.167(a)-3, Income Tax Regs. Where there is no noncompetition covenant the sale of an entire business generally results in capital gains to the seller, with no amount amortizable by the buyer. Petitioner Trugman, the seller, contends that the covenant not to compete included in the purchase agreement was never discussed or separately bargained for by him and Weingold Company, that the allocation of 62 1/2 percent of the purchase price of Trugman's business to the covenant not to compete was artificial, and that the covenant was an integral, non-severable part of the business sold and thus he should be entitled to capital gains treatment on the sale of his entire business. Petitioner Weingold Company, on the other hand, contends that the allocation of $100,000 to the covenant not to compete should be recognized for tax purposes and that it is entitled to ordinary deductions for *388 amortization of its cost of acquiring the covenant not to compete. We are confronted with the situation where one party to a contract is attempting to show that a different value should be placed on a covenant not to compete than the value specified in the contract. Here the contract between Trugman and Weingold Company specifies an allocation of $50,000 to equipment, $10,000 to goodwill, customer lists, accounts and use of names, and $100,000 to a covenant not to compete. Trugman is attempting to prove that the allocation in the contract is artificial, and that the $100,000 allocated to the covenant should be considered a non-severable part of the contract and should be attributed to goodwill. When one party to a contract attempts to prove that an allocation made in that contract does not represent the true agreement of the parties, this Court has traditionally followed what is known as the "strong proof" doctrine, set out in Ullman v. Commissioner,264 F. 2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957) at 308: * * * when the parties to a transaction *389 such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. * * * Petitioner Weingold Company urges us to adopt the so-called Danielson rule, which provides that a party to an agreement may not successfully attack the value specified in a contract without "proof which in an action between the parties to the agreement would be admissible to * * * show its unenforceability because of mistake, undue influence, fraud, duress, etc." Commissioner v. Danielson,378 F. 2d 771, 775 (3d Cir. 1967). The Danielson rule, however, has been rejected by this Court. J. Leonard Schmitz,51 T.C. 306 (1968), affd. sub. nom. Throndson v. Commissioner,457 F. 2d 1022 (9th Cir. 1972). Moreover, the Court of Appeals for the Sixth Circuit, to which this case is appealable, follows the "strong proof" rule of Ullman. Montesi v. Commissioner,340 F. 2d 97 (6th Cir. 1965). We will continue to follow the *390 "strong proof" rule. Trugman advances three arguments as "strong proof" that the amounts allocated to the non-competition agreement were merely payments for goodwill. First, he argues that the covenant not to compete that was included in the contract was never discussed or separately bargained for by Trugman and Weingold Company when they agreed upon a sale price of $160,000. According to Trugman, the allocation of $100,000 of the total purchase price of $160,000 to the covenant was a unilateral act devised by Weingold Company and its sophisticated lawyer, Berman, to take advantage of Trugman and his unsophisticated lawyer, Moss. Trugman contends that he was not aware, until June 25, 1969, the day on which he met with Weingold and Berman to sign the purchase agreement, that a covenant not to compete would be included in the purchase agreement and that 62 1/2 percent of the consideration paid would be allocated to the covenant. He also contends that he was not aware that the transaction would not qualify for capital gains treatment until he was notified by the Internal Revenue Service that a bona fide covenant not to compete had ordinary income tax consequences. We do not agree *391 with Trugman that the covenant not to compete was not separately bargained for. The facts before us indicate that subsequent to the meeting between Trugman and Jack Weingold at which Trugman agreed to sell his business for $160,000, Trugman telephoned his attorney, Moss, to ask advice as to the possible tax consequences of selling his business for $160,000. Moss' response was that the sale of Trugman's business would result in capital gains. Soon thereafter, Berman, the attorney for Jack Weingold, telephoned Moss and told him that a sale was going to take place and that he wanted to work out the terms of the sale with him. Sometime later, discussion was had between the two lawyers, and a written draft of the contract was furnished by Berman to Moss for review. Moss examined the agreement and then marked the proposed draft with pencil notation as to those items which he believed needed further discussion or negotiation. Moss particularly noted the proposed allocation of the total purchase price to equipment, goodwill and a covenant not to compete, and made a notation on his draft of the agreement next to paragraph 3 with the words "don't like." Moss then tried to negotiate the *392 elimination of paragraph 3, but was unsuccessful. He advised Trugman of every detail which transpired during meetings between counsel for both parties. On June 25, 1969, the day on which the agreement was signed, Trugman asked his lawyer what the effect of the allocation would be. Moss responded that in his opinion the entire transaction represented one purchase price of $160,000 for the entire business, and that Trugman should go ahead with the deal. Upon this advice, Trugman signed the written agreement of June 25, 1969, for the sale of his scrap metal business, including the allocation of the purchase price to certain assets. In our opinion there was a "meeting of the minds" on June 25, 1969, with respect to the formal agreement executed by the parties. On that date, both parties read and understood the agreement, including the allocation, and signed the agreement as it was. The agreement of sale was drafted by Berman and then submitted to Moss for his approval. The attorneys for both parties were aware of the terms of the agreement, including the covenant and the allocation of the purchase price to various assets. These items were the subject of discussion and negotiation *393 between the attorneys. And both Weingold and Trugman were kept advised of these discussions and negotiations throughout the bargaining process leading up to the final agreement. Thus we think in these circumstances the covenant not to compete was separately discussed and bargained for. The fact that Trugman may not have understood the tax consequences of his signing the contract does not serve to nullify the agreement. The parties understood the contract and voluntarily entered into it. Trugman cannot now be heard to complain that he overlooked the possible tax consequences of his agreement. The law in this area was clearly expressed in Hamlin's Trust v. Commissioner,209 F. 2d 761 (10th Cir. 1954), where the Court of Appeals said at page 765: the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it. The proposed change in the contract was clear. All parties participating in the conference agreed to it. * * * It is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision, *394 but where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. * * * Trugman, when he signed the agreement, was aware of the allocation provided in paragraph 3, and understood the basic terms of the agreement. The fact that he may have been unaware that the amount paid for the covenant would be treated as ordinary income to him rather than as capital gain is not controlling. The parties negotiated for the sale of the business at arm's-length. It was the responsibility of both parties, with the aid of their attorneys, to be aware of the significant tax aspects of the agreement. The failure of Trugman, or his attorney, to realize the impact of the allocation is perhaps unfortunate, but we are disinclined to rewrite the contract. To allow Trugman a unilateral reformation of the contract would encourage parties to risk litigation after completion of a transaction merely to avoid the undesirable tax consequences of their agreements. We are unwilling to do it. Second, Trugman argues that the allocation of 62 1/2 percent of the purchase price to the covenant not *395 to compete was artificial. He contends that an analysis of the purchase agreement demonstrates that the allocation of $100,000 of the $160,000 purchase price to a covenant not to compete is inconsistent with its other terms, and that the allocation was inserted after an agreement or "meeting of the minds" had been reached. The very terms of the agreement, Trugman argues, contradict and are inconsistent with a contention that there was a separate allocation of the purchase price to the covenant not to compete. Specifically, Trugman maintains that if the allocation of $100,000 to the covenant not to compete had substance, the agreement drawn by the attorney for Weingold Company would have excluded that $100,000 from the total purchase price in structuring the transaction to qualify for installment method reporting under section 453 of the Code. Other contract provisions which Trugman claims support his position are a provision which limits payment of the purchase price in the first year to 30 percent of the total purchase price, and a provision which states that the purchaser has no right to prepay any part of the balance of the unpaid purchase price before January 1, 1970. Trugman *396 claims that these three provisions make it clear that the parties contemplated installment sale treatment of the total purchase price of $160,000, rather than a breakdown of the total price into several components. We disagree with Trugman that these inconsistencies prove that the allocation of $100,000 to the covenant was artificial. It appears to us that the installment sale treatment provided for in the written contract was intended for the benefit of the seller, Trugman. It is highly likely that the attorney for Trugman, Nelson Moss, suggested the installment sale method as a device to aid his client. Any inconsistency which exists within the contract between the allocation of $100,000 to the covenant not to compete, on the one hand, and installment sale treatment, on the other, was the result of Moss' efforts to secure those benefits for his client. Trugman also points out that the time period for payment of the purchase price was not commensurate with the duration of the covenant not to compete. He contends that if the parties had intended a separate payment for the covenant not to compete they would have provided for payments over the entire duration of the covenant *397 so that Weingold Company would have been in a position to enforce Trugman's covenant by withholding payment. There is no evidence that Weingold Company could not have prevented Trugman from reentering the scrap metal business by bringing an action for damages or specific performance. The fact that Trugman did honor his covenant not to compete, and reentered the scrap metal business about four months after the covenant had expired, covinces us that there was no real need for the contract to provide that payments would be made over the entire term of the covenant. We reject Trugman's argument that this provision proves that the allocation to the covenant was meaningless. Paragraph 4(b) of the agreement provides that the balance due after 1969 shall be paid in twelve equal quarterly installments, "together with interest * * * at the rate of Seven Per Cent (7%) per annum." Paragraph 5 provides that Weingold Company shall deliver to Trugman its "negotiable Promissory Note" and that the note shall be fully guaranteed and endorsed by Weingold personally. Trugman asserts that the provisions of paragraphs 4 and 5 are the type that are clearly applicable to and intended for a transaction *398 involving the purchase of property. They are completely inconsistent, he argues, with any notion that the purchaser was separately bargaining for and paying for a covenant not to compete. The interest provisions are clearly consistent with the note obligation. We do not believe that provision for a note in a contract to cover the payment of the balance due on a buyer's obligation is inconsistent with the allocation in this contract to a covenant not to compete. In sum, we do not agree with Trugman that an analysis of the contract itself proves that the allocation of 62 1/2 percent of the purchase price to a covenant not to compete was artificial. Third, Trugman argues that the convenant not to compete was an integral, non-severable part of the business sold by him to Weingold Company. He contends that where a covenant not to compete accompanies the transfer of goodwill in the sale of a going business, and the covenant has the primary function of assuring the purchaser of the beneficial enjoyment of the goodwill which is acquired, the covenant should not be treated as a separate item for tax purposes.See Aaron Michaels, 12 T.C. 17 (1949). According to Trugman, *399 the evidence shows that without his key salesman, Ettkin, and his equipment, he was unable to compete with Weingold Company for industrial accounts. He says he was concerned about his health, stiff competition from Weingold Company and the lawsuit which Weingold Company had brought against him, and that he had virtually no choice but to sell his business. He argues that the covenant was of no real value to Weingold since the evidence shows that Trugman presented no real competitive threat to Weingold Company after the sale in view of its lack of interest in hiring him and the requirement of the sale that Ettkin work for Weingold Company. His position is that the amount of the consideration allocated to the covenant is patently unrealistic in light of the value of the tangible and intangible assets sold, the lack of any value of Trugman to the business, and his state of health at the time of the sale. Thus, he argues that the covenant against competition had no value independent of the goodwill of the business and should be treated as part of the goodwill. Again we must disagree with Trugman. It is clear from the evidence that although Trugman had some problems with his health, *400 he was still only 52 years old at the time of the sale and his health was not such that he could not have continued in business. The further fact that he reentered the scrap metal business just four months after the 5 year covenant expired, covinces us that the threat of competition from Trugman was very real at the time the agreement was signed. Nor do we believe that the success of Supreme was totally dependent on the services of Ettkin. The evidence establishes that Trugman had built up a fairly successful business even before Ettkin became an employee of Supreme, and that Weingold was fully capable of carrying on the business by himself. The severe competition which developed between Supreme and Weingold Company leading up to the filing of the lawsuit on June 10, 1969, convinces us that Weingold, wheu he purchased Supreme, was primarily interested in removing Trugman as a source of competition. Weingold, when he successfully bargained for a non-competition agreement, was seeking to ensure that Trugman could not compete with him for at least 5 years. The allocation of $100,000 to the covenant not to compete in the written contract between Trugman and Weingold was not a sham. *401 It had economic reality and was not merely incidental to the transfer of Trugman's goodwill. We think the amount of consideration allocated to the covenant was realistic in light of the value of the tangible and intangible assets sold. Trugman's 1969 Federal income tax return reflects the sale of his scrap metal business, including equipment and goodwill, for $160,000, with his basis shown thereon as $48,491 and depreciation taken thereon of $8,951.82. The allocation in the contract of $50,000 to equipment appears reasonable in light of this evidence. The parties, bargaining at arm's-length, allocated the remaining $110,000 to goodwill ($10,000) and to a covenant not to compete ($100,000).Trugman has not provided us with convincing evidence that this allocation was unreasonable or unfairly obtained. In the absence of such evidence, we will not attempt to rewrite the contract merely to release Trugman from the consequences of the agreement. Trugman relies heavily on the case of John W. Shleppey, T.C. Memo. 1963-165, to support his position. The taxpayer in Shleppey was the proprietor of an outdoor advertising business. He sold his business in 1956 to *402 George L. Knapp for $220,000. The purchase agreement provided that $140,000 of the purchase price was being paid for a covenant not to compete. The agreement also provided that the taxpayer would receive a down payment of $60,000, an amount less than 30 percent of the total purchase price, so that the sale could qualify as an installment sale under section 453. At no time during any of the discussions between the purchaser, Knapp, and taxpayer, and the negotiations leading up to the formulation of the sales agreement, had either party mentioned a covenant not to compete. After the contract had been prepared and was presented to the taxpayer for his signature, taxpayer noticed the provision relating to the covenant not to compete. When the taxpayer asked Knapp what the covenant meant, Knapp informed taxpayer, who was without legal assistance, that the covenant would not hurt him in any way, and that in fact it would be of some benefit to him. Relying on Knapp's representations, taxpayer signed the sales agreement. The Court in Shleppey also found as a fact that the physical assets transferred to Knapp by taxpayer were worth at least $220,000. We think the Shleppey *403 case is clearly distinguishable from the instant case. First, in Shleppey, there was no mention of a covenant not to compete prior to the time taxpayer saw the covenant in the contract. In the instant case, Moss, Trugman's lawyer, was aware of the covenant and the specific allocation long before a final agreement was reached. The contract was prepared by Berman and submitted to Moss for his approval.Moss then examined the draft and marked his copy with the notation "don't like" next to paragraph 3, containing the proposed allocation, and tried to negotiate the removal of this provision from the contract, but was unsuccessful.The fact that the attorney for Weingold Company successfully resisted Moss' demands to delete the paragraph indicates the importance of that provision to Weingold Company. Second, in Shleppey, the taxpayer was not represented by counsel and when the taxpayer inquired as to the meaning of the covenant, Knapp misrepresented the facts and told him that the covenant would be beneficial to the taxpayer. In the present case there is no evidence of deceit or misrepresentation on the part of Weingold or his attorney. Weingold merely insisted on the contract *404 as drafted and successfully resisted Trugman's attempts to have it changed. Third, the evidence in Shleppey indicates that the allocation of $140,000 to the covenant was artificial, since the assets being transferred to Knapp by taxpayer were worth at least $220,000. In the instant case the evidence shows that Trugman's equipment was worth only about $50,000; thus the allocation of the remaining $110,000 between goodwill ($10,000) and a covenant not to compete ($100,000) seems reasonable. Accordingly, we hold that Trugman has failed to present the "strong proof" required to overcome the declarations made in the contract of June 25, 1969. To reflect this conclusion, Decision will be entered for the petitioner in docket No. 4824-74. Decision will be entered for the respondent in docket No. 7168-74.