T.C. Memo. 2016-44

UNITED STATES TAX COURT

MAKRIC ENTERPRISES, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1017-13.                    Filed March 9, 2016.

George W. Connelly, Jr., for petitioner.

Candace M. Williams, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  The respondent (the "IRS") issued a notice of

deficiency to the petitioner, Makric Enterprises, Inc. ("Makric"), for its short tax

year April 1 to September 30, 2008.  In the notice, the IRS determined an income-

tax deficiency of $2,839,780 and an accuracy-related penalty under section

[*2] 6662(a)[1] of $567,956.  The deficiency and the penalty relate to a September 2008 transaction that the IRS alleges was the sale by Makric of the stock of its wholly owned subsidiary, Alpha Circuits, Inc. ("Alpha").  Makric contends that the transaction should instead be treated as the sale of Makric stock by Makric's shareholders.  Makric timely filed a petition under section 6213(a) for a redetermination of the deficiency and the penalty.  We have jurisdiction under section 6214.

The two issues before the Court are:

(1)  Did Makric sell the stock of Alpha in 2008?  We hold that it did.  In particular:  (a) we hold that the agreement that effected the transaction unambiguously required the sale of Alpha, not Makric, and that therefore Makric is barred from contending that the transaction was, in substance, the sale of Makric, (b) we reject Makric's argument that, in executing the agreement, the parties to the agreement made a mutual mistake which justifies reformation of the agreement, and (c) we hold that in substance the transaction was the sale of Alpha.

(2)  Is Makric liable for an accuracy-related penalty under section 6662(a)?  We hold that it is.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the year at issue.

[*3]                                         FINDINGS OF FACT

Some facts have been stipulated, and they are so found.  Makric was a Texas corporation.  When it filed the petition in this case, its principal office was in Texas.[2]  Makric was founded on June 28, 1996, by Mark Kisner and Rickey Williams, the two original shareholders.[3]  Originally, Kisner and Williams each owned 50% of the company's shares.

Kisner and Williams created Makric to serve as the holding company for Alpha, a contract manufacturer that they sought to acquire.  Kisner and Williams believed that using a holding company to acquire Alpha (rather than directly acquiring Alpha) would enhance their flexibility to acquire additional companies in the future.  Makric acquired all of Alpha's stock on July 8, 1996.  Kisner and Williams intended to have Makric hold Alpha for only several years, during which time they believed Alpha could be made more profitable.  Kisner and Williams hoped to eventually dispose of Alpha for a gain.  At the time Makric acquired Alpha, Kisner and Williams were unsure of how they would ultimately dispose of Makric's interest in Alpha.  However, their goal was always to dispose of

_____

[2]This case is therefore appealable to the U.S. Court of Appeals for the Fifth Circuit unless the parties stipulate another circuit.  See sec. 7482(b)(1)(B), (2).

[3]The name "Makric" is a combination of letters of the names Mark Kisner and Rickey Williams.

[*4] Makric's interest in Alpha in a way that would cause any income they realized from the sale to be treated as long-term capital gain.

Before the 1996 acquisition of Alpha by Makric, Kisner worked in the electronics business for Texas Instruments. At some point, he left Texas Instruments and assumed the role of CEO for both Makric and Alpha. In his capacity as CEO of Alpha, he managed Alpha's day-to-day operations. This included overseeing its factory and the development of its products. Kisner also served on the board of directors for Makric and served as chairman of Alpha's board of directors. He continued to serve as Alpha's CEO and as a member of its board until Makric sold Alpha in September 2008. The record does not indicate whether Kisner remained on Makric's board of directors after it sold Alpha.

Williams served as a director on the boards of both Makric and Alpha and held those positions at the time Alpha was sold. He served as president of Makric and was its president at the time Makric sold Alpha. He also served as Alpha's president from the time Makric purchased Alpha, in 1996, until sometime in 2001 (although he remained a member of Alpha's board of directors after 2001). For some or all of the time that he was the president of Alpha, he was involved with Alpha on a day-to-day basis and handled the company's financial affairs. The

[*5] record does not indicate whether Williams remained on Makric's board of directors after it sold Alpha.

Sometime before May 2004, Williams approached his friend Jim Wilson about investing in Makric. Wilson had a business background in mezzanine lending and private equity. On May 28, 2004, Wilson purchased half of Williams's 50% interest in Makric. After this purchase, Wilson was a 25% shareholder in Makric, Williams was a 25% shareholder in Makric, and Kisner remained a 50% shareholder in Makric. Wilson became a board member of both Makric and Alpha and continued serving as a member of Alpha's board until Makric sold Alpha in 2008. The record does not indicate whether Wilson remained a member of Makric's board after it sold Alpha.

Kisner, Williams, and Wilson are referred to collectively as "Makric's shareholders". At no time did any of them own a direct interest in Alpha. The positions that Makric's shareholders held in Makric and Alpha (and their ownership percentages in Makric) until Alpha was sold in September 2008 are summarized in the following table:

| [*6] Corporation | Kisner | Williams | Wilson |
|---|---|---|---|
| Makric | CEO | President | |
| | Member of board | Member of board | Member of board (starting 2004) |
| | 50% Shareholder | 25% Shareholder after selling half his 50% interest to Wilson in 2004 | 25% Shareholder (starting 2004) |
| Alpha | CEO | President (1996-2001) | |
| | Chairman of board | Member of board | Member of board (starting 2004) |

The record does not reveal that anyone besides Kisner, Williams, and Wilson served on the board of directors of Alpha or Makric until the sale of Alpha in September 2008.

In 2004, at the time Wilson acquired his interest in Makric, Makric's shareholders entered into a shareholders agreement. Among other things, the shareholders agreement provided that

> beginning three years from the date hereof, the Stockholders [i.e., Makric's shareholders] and the Company [i.e., Makric] will engage

[*7]    the services of one or more investment bankers for the sale of all of the assets of or shares in the Company [i.e., Makric] * * *.[4]

Thus, the provision contemplated the potential sale of either (1) Alpha stock (the "assets of" Makric) by Makric or (2) Makric stock (the "shares in" Makric) by Makric's shareholders.

Because Makric was the holding company for Alpha and had no operating business of its own, those who did business with Alpha were generally unfamiliar with Makric. Makric's shareholders and advisers sometimes used the names "Alpha" and "Makric" interchangeably or, more commonly, they used "Alpha" to refer collectively to both Makric and Alpha. However, Makric's shareholders understood that they owned direct interests only in Makric, not in Alpha, that the two corporations were separate and distinct, and that Alpha was Makric's subsidiary.

Sometime in 2007, Makric's shareholders began making arrangements to sell Alpha. To this end, on July 11, 2007, acting in their capacities as the directors of Alpha, they signed a document entitled "Consent of Board of Directors in Lieu of Annual Meeting". As of this time, Kisner owned 50% of Makric, and Williams and Wilson each owned 25% of Makric. The consent authorized, among other

---

[4]The shareholders agreement is dated May 28, 2004.

[*8] things, the listing of Alpha for sale. The consent also authorized the hiring of the investment bank Gulf Star Group Investment Bankers "to represent the shareholders [meaning Makric's shareholders] in the sale." Gulf Star's services with respect to the sale of Alpha included finding buyers for Alpha.

At the time that Makric's shareholders began making arrangements for the disposition of Alpha, they contemplated the following two-step sale structure:

(1) Makric would be dissolved and its Alpha stock distributed to Makric's three shareholders (Kisner, Williams, and Wilson), and

(2) Kisner, Williams, and Wilson (now shareholders of Alpha) would sell Alpha stock to a buyer.

It was originally thought that the two-step structure, whereby (1) Makric dissolves and (2) Makric's shareholders sell Alpha stock, would meet the tax objectives of Makric's shareholders, i.e., that the gains from the sale of Alpha would be treated as long-term capital gain to Kisner, Williams, and Wilson.

Among the steps that Gulf Star undertook to find a buyer for Alpha was to prepare a sales memorandum, which Gulf Star distributed to prospective buyers. This memorandum indicated that the entity for sale was Alpha. It described Alpha's history, operations, management, and projected growth. It stated that

[*9] Alpha was owned by Makric, but that Makric was in the process of being dissolved.

Gulf Star found several prospective buyers who expressed interest in buying Alpha. On October 30, 2007, Southfield Capital Advisors, LLC ("Southfield"), a private-equity firm, submitted a nonbinding indication of interest expressing Southfield's interest in purchasing Alpha. On February 6, 2008, Southfield submitted a letter of intent regarding its potential purchase of Alpha and expressing its intent to purchase Alpha from Williams, Wilson, and Kisner. The letter did not mention Makric.[5] In the letter, Southfield stated that it intended for one of its affiliates, TS3 Technology, Inc. ("TS3"), to acquire Alpha. David Brunson, the chairman of TS3, signed the letter of intent on behalf of Southfield. Kisner signed the letter as CEO of Alpha and as a shareholder of Alpha. Williams and Wilson both signed as shareholders of Alpha. By signing the letter of intent,

---

[5]Kisner testified that another company, Main Street Capital, also submitted a letter of intent regarding the purchase of Alpha. That letter is not in the record, and the record does not otherwise reveal the precise terms offered in that letter. We infer from the record, particularly from Kisner's testimony, that Makric's shareholders never signed the letter of intent from Main Street Capital and decided instead to pursue negotiations with Southfield. Kisner testified that Southfield's proposed terms, including its proposed purchase price, were more generous than Main Street Capital's. In its letter of intent, Southfield stated that it valued Alpha at $16.5 million and made a "nonbinding confidential proposal" to pay that amount for Alpha.

[*10] they agreed to the terms of the letter. These terms included, among other things, the creation of an "exclusivity period" during which (1) Alpha would not solicit offers or engage in negotiations with any other parties and (2) Alpha would give Southfield "full and complete access to its books, records, contracts, personnel [etc.]". The letter of intent did not commit Southfield or TS3 to buying Alpha.

Makric's shareholders hired Gary Miller of the law firm Boyar & Miller to represent them and Alpha in the sale. An engagement letter, dated February 15, 2008, authorized Miller to represent

> Rickey G. Williams, Mark Kisner, James P. Wilson ( * * * collectively the "Shareholders") and Alpha Circuits, Inc. (the "Company"), in connection with the proposed sale of 100% of the stock of the Company owned by the Shareholders * * *.

The engagement letter did not mention Makric and thus seemed to assume that Makric's shareholders would own Alpha stock directly when it came time to sell Alpha. Makric's shareholders signed the letter in their individual capacities, signifying their agreement to have Miller represent them in connection with the sale of Alpha. Kisner signed the letter on behalf of Alpha, signifying Alpha's agreement to have Miller represent it in the sale.

[*11] Southfield's representatives generally understood that Makric's shareholders intended to structure the sale in a way that would result in the income realized by Makric's shareholders upon the sale being characterized as long-term capital gain for federal-income-tax purposes. Southfield and its representatives were willing to structure the sale in a way that would meet the tax objectives of Makric's shareholders.

Consistent with the two-step sales structure originally preferred by Makric's shareholders, Southfield and Makric initially proceeded in negotiations with the understanding that TS3 would purchase Alpha stock directly from Kisner, Williams, and Wilson, who would directly hold Alpha stock following the anticipated dissolution of Makric.

Early drafts of the stock purchase agreement also reflected the two-step sale structure.[6] Version 1 of the stock purchase agreement (dated February 22, 2008) was drafted so as to be executed by the following parties: TS3, defined as the "Buyer", and Kisner, Williams, and Wilson, collectively defined as the "Sellers". The draft recited that "Sellers own all of the outstanding capital stock of Alpha

---

[6]The record contains five drafts of the stock purchase agreement, which are identified in the stipulation of facts as "Version 1" (dated February 22, 2008), "Version 2" (undated), "Version 3" (undated), "Version 4" (dated March 3, 2008), and "Version 5" (dated March 3, 2008).

**[*12]** Circuits, Inc. * * * (the 'Company')" and that "Sellers desire to sell, and Buyer desires to buy, all of the outstanding capital stock of the Company."

Section 2.1, "Purchase and Sale", provided:

> Sellers agree to sell to Buyer, and Buyer agrees to purchase from Sellers, all of the issued and outstanding shares of common stock * * * of the Company * * * (the "Shares").

Section 2.5 of the draft, "Deliveries at the Closing", provided: "Sellers will deliver, or cause to be delivered to Buyer * * * certificates representing all of the Shares". This draft, as well as Versions 2 and 3 of the stock purchase agreement (both undated), provided that Kisner, Williams, and Wilson would sell Alpha stock to TS3, thus reflecting the assumption that Makric would dissolve before the sale.

At some point, Makric's shareholders determined that the two-step structure would not meet their tax objectives, so they abandoned the structure. The following stipulations by the IRS and Makric address the abandonment of the two-step structure:

> Initially, it was contemplated that the sale of Alpha would be effected through Petitioner [i.e., Makric] being dissolved, the shares of Alpha being distributed to the Shareholders [i.e., Kisner, Williams, and Wilson], and the Shareholders directly selling the stock of Alpha to the Buyer (the "Original Transaction Structure").

*     *     *     *     *     *     *

**[\*13]** In late 2007, the Shareholders raised concerns that under the Original Transaction Structure it was unclear whether the Shareholders' holding period in Petitioner's stock would "tack" onto Alpha's stock, thus jeopardizing the long-term capital gain treatment the Shareholders required.

The Original Transaction Structure was rejected by the Shareholders because they were concerned that under the Original Transaction Structure long-term capital gain treatment could not be guaranteed for them.

Makric's shareholders next decided that they preferred an alternative sale structure whereby Makric's shareholders would sell their shares of Makric to TS3, so that TS3 would acquire Alpha as a subsidiary of Makric. They determined that this sale structure would meet the objective of having the income realized from the sale treated as long-term capital gain.[7] Kisner, who was the lead negotiator for Makric, informed TS3's representatives and/or advisers of the decision not to dissolve Makric and to restructure the sale as the purchase of Makric by TS3. These conversations took place at a meeting and during a conference call.[8] The dates of

---

[7]Kisner and Williams acquired their Makric stock in 1996. Wilson acquired his Makric stock in 2004. Because they had held their Makric stock for more than one year before they planned to sell Makric or Alpha, a taxable sale of their Makric stock would have generated long-term capital gain to the shareholders. See infra note 30.

[8]Kisner credibly testified that he discussed the structure at a meeting and a conference call with TS3's representatives and advisers, including, we presume, Brunson. Kisner also testified that TS3 agreed to the structure at the meeting and

(continued...)

[*14] this meeting and the conference call are unclear. On the morning of February 28, 2008, Kisner and David Ronn, TS3's lawyer, had the following email exchange in which Ronn asked Kisner:

> In the presentation[9] we received, it indicated that Makric was going to be dissolved so that the three shareholders of Makric would then own Alpha Circuits in the same manner that they owned MakRic [sic]. Is that still going to occur or is MakRic [sic] going to be the seller of Alpha Circuits.

Kisner responded to Ronn later that morning, stating:

> MakRic [sic] didn't get dissolved. The purchase will be MakRic [sic] which owns 100% of Alpha's shares.

Kisner's response intended to explain to Ronn that TS3 would purchase Makric. Kisner did not receive confirmation that Ronn received this email.

Soon after the email exchange, Ronn (who had written earlier drafts of the stock purchase agreement) prepared a new draft (Version 4) of the stock purchase agreement (dated March 3, 2008). This draft did not reflect the structure discussed by Kisner in his February 28, 2008 email (i.e., the sale of Makric stock), nor did it

---

8(...continued)
the conference call. As discussed infra p. 54, we believe that a representative of TS3 assented to the structure, but we do not go so far as to find that this assent constituted a final or unchanging expression of TS3's intent.

9Apart from what is stated in this email, the record does not indicate the content of this "presentation" or who made the "presentation".

[*15] reflect the original two-step structure of dissolving Makric and having Makric's former shareholders sell Alpha stock. Instead, the draft reflected a third structure, under which Makric would sell Alpha stock to TS3 instead of dissolving. The new draft identified the parties to the transaction as:

> [TS3] ("Buyer"), MAKRIC Enterprises, Inc., a Texas Corporation ("Seller") and Mark Kisner ("Kisner"), Rickey Williams ("Williams"), and Jim Wilson ("Wilson") * * * (each individually an "Owner", and collectively, the "Owners").

The draft recited:

> WHEREAS, Seller [i.e., Makric] owns all of the outstanding capital stock of Alpha Circuits Incorporated, a Texas corporation (the "Company").

> WHEREAS, Owners [i.e., Makric's shareholders] own 2,000 shares of the common stock of the Seller * * *.

> WHEREAS, Seller [i.e., Makric] desires to sell, and Buyer [i.e., TS3] desires to buy, all of the outstanding capital stock of the Company [i.e., Alpha] * * *.

Section 2.1, "Purchase and Sale of Shares at Closing", provided:

> Seller [i.e., Makric] agrees to sell to Buyer [i.e., TS3], and Buyer agrees to purchase from Seller, all of the issued and outstanding shares (the "Shares") of common stock * * * of the Company [i.e., Alpha] ("Company Common Stock").

Section 2.5, "Deliveries at Closing", provided:

> At the closing: (i) Seller [i.e., Makric] and Owners [i.e., Makric's shareholders], as the case may be, will deliver, or cause to be

**[*16]**   delivered, to Buyer [i.e., TS3] * * * certificates representing all of the Shares [of Alpha] * * *.

Ronn wrote a subsequent draft (Version 5), the relevant terms of which were substantively identical to those of Version 4 described above.  Kisner and Miller reviewed each of these drafts, but Kisner did not realize that the drafts called for the sale of Alpha by Makric.

Makric and the IRS have stipulated that after Version 5 there were eleven more versions of the stock purchase agreement and that each of these versions "list" Makric as the "Seller" of Alpha, TS3 as the "Buyer", and Kisner, Wilson, and Williams as "Owners" of Makric.  We take this stipulation to mean that under the terms of these eleven drafts, as with Version 4 and Version 5, Makric would sell its stock in Alpha to TS3.  Other than this stipulation, the record does not reveal the terms of these eleven drafts of the stock purchase agreement.  The drafts themselves are not in the record.

Possibly around the time that Makric's shareholders decided not to dissolve Makric, Ronn and associates at his law firm began conducting a due diligence inquiry into both Makric and Alpha.[10]  The information sought by Ronn's firm

---

[10]Due diligence refers to a prospective buyer's investigation of a company that the buyer seeks to acquire for the purpose of determining the company's assets and liabilities.

[*17] pertained to, among other things, the companies' finances, personnel, employment contracts, and litigation.

On September 30, 2008 (seven months after Kisner emailed Ronn informing him that the transaction should be structured as the sale of Makric), Makric, TS3, and Makric's shareholders executed the stock purchase agreement. Kisner and Miller reviewed the stock purchase agreement before the closing of the sale, but Kisner did not realize the agreement called for the sale of Alpha by Makric. The terms set forth in the stock purchase agreement were, in pertinent respects, identical to the terms set forth in Version 4 and Version 5 of the draft stock purchase agreement. The stock purchase agreement provided:

> This Stock Purchase Agreement (this "Agreement") is made as of September 30, 2008, by and among TS3 Technology, Inc., a Delaware corporation ("Buyer"), MAKRIC Enterprises, Inc., a Texas corporation ("Seller"), and Mark A. Kisner ("Kisner"), Rickey Williams ("Williams"), and James P. Wilson ("Wilson") * * * (each individually, an "Owner", and collectively, the "Owners").

In the section entitled "Recitals", the stock purchase agreement stated:

> WHEREAS, Seller [i.e., Makric] owns all of the issued and outstanding capital stock of Alpha Circuits, Incorporated, a Texas corporation (the "Company");

> WHEREAS, Owners [i.e., Makric's shareholders] own all of the issued and outstanding stock of Seller [i.e., Makric]; and

[*18] WHEREAS, Seller [i.e., Makric] desires to sell, and Buyer [i.e., TS3] desires to buy, all of the outstanding capital stock of the Company [i.e., Alpha] on the terms and subject to the conditions set forth in this Agreement.

Section 2.1 of the stock purchase agreement, "Purchase and Sale" provided:

Seller [i.e., Makric] agrees to sell to Buyer [i.e., TS3], and Buyer agrees to purchase from Seller, all of the issued and outstanding shares (the "Shares") of common stock * * * of the Company [i.e., Alpha] ("Company Common Stock").

Section 2.5 of the stock purchase agreement, "Deliveries at the Closing" provided:

At the closing:  (i) Seller [i.e., Makric] and Owners [i.e., Makric's shareholders], as the case may be, will deliver, or cause to be delivered, to Buyer [i.e., TS3] * * * certificates representing all of the Shares [i.e., all common stock of Alpha].

The stock purchase agreement was signed by Brunson (chairman of TS3), by Williams (as president of Makric), and by Makric's shareholders (as "Owners") on September 30, 2008.

The stock purchase agreement contained several provisions that referred to Kisner, Williams, and Wilson by name, or that referred to them collectively as Makric's "Owners".  Among these provisions was Section 3, "Representations and Warranties of Seller and Owner", which made Makric and its "Owner[s]" liable for various warranties and representations:  "Seller [i.e., Makric] and each Owner [i.e., Kisner, Williams, and Wilson], hereby represent and warrant jointly and

[*19] severally with respect to warranties covering Seller, and severally and not jointly with respect to representations and warranties covering such Owner".

Among these representations was a provision, Section 3.1, "Valid and Binding Agreement", that stated:

> Each Owner [i.e., Kisner, Williams, and Wilson] is an individual and, as such has the legal capacity to execute and deliver this Agreement, and to perform his obligations hereunder to consummate the transactions contemplated hereunder. This Agreement has been duly executed and delivered by Seller [i.e., Makric] and constitutes the valid and binding obligation of Seller, enforceable against it in accordance with its terms * * *. The execution and delivery of this Agreement, the performance by each Owner of his obligations hereunder and the consummation by each Owner of the transactions contemplated hereby have been duly authorized by all requisite action on the part of each Owner.

Another provision, Section 3.5, "Brokerage Arrangements", stated:

> Except with regard to amounts due to Gulfstar Group upon the Closing * * * no Person[11] will be entitled to receive any brokerage commission * * * or similar compensation in connection with the transactions contemplated by this Agreement based on any Contract[12] made by or on behalf of Seller [i.e., Makric] or Owners

---

[11]The agreement defined "Person" as: "any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, Governmental Entity or other entity."

[12]The agreement defined "Contract" as: "a contract, agreement, commitment or binding understanding, whether oral or written, that is in effect as of the date of this Agreement."

**[*20]** [i.e., Kisner, Williams, and Wilson] for which Buyer [i.e., TS3] or the Company [i.e., Alpha] is or could become liable or obligated.

There were three other representations and warranties in Section 3 of the stock purchase agreement. Furthermore, Section 4 of the stock purchase agreement provided that "Seller [i.e., Makric] and each Owner [i.e., Makric's shareholders], jointly and severally represent and warrant to Buyer [i.e., TS3] that, as of the Closing Date": Makric was duly organized, Makric was in compliance with its organizational documents, Makric was not in violation of any law, Makric's financial statements represented fairly its financial position, there were no legal claims against Makric, and all of Makric's significant contracts were listed in the agreement.

On the same day that the stock purchase agreement was executed, Makric's shareholders executed another document relating to the sale. This document, entitled "Joint Written Consent of the Shareholders and Directors in Lieu of a Special Meeting", authorized Makric to sell its stock in Alpha to TS3. The document began with this recital:

> Whereas, Mark A. Kisner, Rickey Williams and James P. Wilson (collectively, the "Shareholders"), own all of the issued and outstanding capital stock of the "Corporation" [i.e., Makric];

**[*21]** Whereas, the Corporation owns all of the issued and outstanding capital stock of the Alpha Circuits Incorporated, a Texas Corporation (the "Company");

Whereas, the Corporation desires to sell all of the outstanding capital stock of the Company (the "Subject Stock"), to TS3 Technology, Inc. * * *.

Makric's shareholders each signed this consent form twice: once in their capacities as directors of Makric and once in their capacities as shareholders of Makric. The record does not reveal who drafted this consent form. Neither Kisner, Williams, nor Wilson closely reviewed this document before signing it.

Also on September 30, 2008, Kisner, as Makric's CEO, signed a document entitled "Written Consent of Sole Shareholder of Alpha Circuits Incorporated". This document stated:

RESOLVED, that immediately prior to the consummation [of] the transaction contemplated by that certain Stock Purchase Agreement between the MAKRIC Enterprises, Inc. (the "Sole Shareholder"), TS3 Technology, Inc. (the "Purchaser") and the owners of the Sole Shareholder, pursuant to which the Sole Shareholder has agreed to sell all of the shares of the common stock of the Company (the "Stock Purchase Agreement"), the resignations of the existing directors of the Company [i.e., Alpha], Mark Kisner, Rickey Williams and James P. Wilson, be and hereby are accepted by the Sole Shareholder.

Kisner did not closely review this document either before he signed it or when he signed it. The record does not reveal who drafted this consent form. (We refer to

[*22] the two consent forms described above and the stock purchase agreement, collectively, as the "transactional documents".)

Neither Kisner, Miller, nor any of Makric's other shareholders, representatives or advisers objected to the terms set forth in the stock purchase agreement. The stock purchase agreement and the several drafts that preceded it provided that Makric would sell Alpha stock. Even so, Kisner reviewed the stock purchase agreement and prior drafts and concluded that the documents provided that Makric's shareholders would sell their Makric stock. Ronn, TS3's lawyer, did not tell him otherwise.

The stock purchase agreement required the "Buyer", i.e., TS3, to make four types of payments.

First, TS3 was required to pay Alpha's creditors the amounts set forth on Schedule 4.9(e)(2) of the stock purchase agreement. There is no Schedule 4.9(e)(2) attached to the stock purchase agreement. Therefore, the amounts to be paid to Alpha's creditors cannot be determined from the text of the stock purchase agreement.

Second, Section 9.2 of the stock purchase agreement required TS3 to pay the transaction costs of the Seller (i.e., Makric) and the Owners (i.e., Makric's shareholders) described on Schedule 9.2 of the stock purchase agreement to the

[*23] extent that Makric and Makric's shareholders set forth the amounts of these costs on Schedule 9.2. Any such costs described on Schedule 9.2 had to be paid to the "applicable vendor" listed on Schedule 9.2. There is no Schedule 9.2 attached to the stock purchase agreement. Therefore, no payment was required of TS3 by Section 9.2 of the stock purchase agreement.

Third, Section 2.6 of the stock purchase agreement required TS3, after the closing, to make a payment to Makric if Alpha's working capital at closing exceeded the amount of working capital agreed upon in the stock purchase agreement. Alternatively, if Alpha's working capital at closing was less than the amount of working capital agreed upon in the stock purchase agreement, Makric would be required to make a reverse payment to TS3. Section 2.6 of the stock purchase agreement defined what was meant by (1) Alpha's working capital at closing and (2) Alpha's working capital agreed upon in the purchase agreement. Both of these amounts were defined in part by reference to Schedule 2.6 of the stock purchase agreement. There is no Schedule 2.6 attached to the stock purchase agreement. Therefore, the amount of the working-capital-adjustment payment (or reverse payment) cannot be determined from the stock purchase agreement.

**[*24]** Fourth, TS3 was required to pay Makric an amount equal to:

| the "Purchase Price" | – | the amounts set forth on Schedule 4.9(e)(2) | – | "any expenses described on Schedule 9.2" |
|---|---|---|---|---|

This amount was required to be delivered "by wire transfer of immediately available funds to the accounts designated by Seller [i.e., Makric] to Buyer [i.e., TS3] no later than three Business Days prior to the Closing", according to the stock purchase agreement. The "Purchase Price" was defined by Section 2.2 of the stock purchase agreement. Section 2.2 provided:

> The aggregate purchase price (the "Purchase Price") for the Shares [i.e., the common stock of Alpha] is $16,500,000 million in cash paid by Buyer, subject to adjustment pursuant to Section 2.6 of this Agreement and any payments provided for in Section 9.2 of this Agreement.

Section 9.2 provided that any expenses described on Schedule 9.2 "shall be paid by Buyer [i.e., TS3] at Closing and the amounts so paid shall be offset against and serve as a reduction of the amount of the Purchase Price paid by Buyer at Closing."

In summary, there are at least two impediments to determining how much TS3 was required to pay under the stock purchase agreement. First, the amounts set forth on Schedule 4.9(e)(2) cannot be determined because of the absence of Schedule 4.9(e)(2). Second, the working-capital adjustment payment required by

**[\*25]** Section 2.6 of the stock purchase agreement cannot be determined because of the absence of Schedule 2.6. Despite these impediments to determining how much TS3 was required to pay Makric under the stock purchase agreement, we conclude that the amount required to be paid by TS3 under the stock purchase agreement--and the amount actually paid by TS3--was $16.5 million. This conclusion is justified by the particular circumstances of the case, which we describe below.

In the notice of deficiency, the IRS had determined that Makric's gain on the sale of Alpha was $8,060,137. Makric does not contest that this is the correct amount of gain in the event that it is determined to have sold Alpha. Furthermore, Makric stipulated that its adjusted basis in Alpha stock was $8,439,863. Under the Internal Revenue Code, Makric's gain on the sale of Alpha is equal to the amount realized from the sale minus its adjusted basis in Alpha stock. Sec. 1001(a).

[*26] Because it is undisputed that Makric's gain is $8,060,137 and that Makric's adjusted basis is $8,439,863, the amount realized is $16.5 million.[13] Therefore, we conclude that Makric received $16.5 million for Alpha's stock. It is apparent that some of that amount ended up in the hands of Makric's shareholders. However, the record does not reveal the exact amount.

On January 27, 2009, John O'Brien of Gulf Star sent an email to Michael Baudler, Makric's CFO, to suggest that Makric file a short-year federal-income-tax return for the period April 1 to September 30, 2008. O'Brien began his email by stating that he had reviewed the stock purchase agreement. He claimed (erroneously) that under the agreement, Makric's shareholders had sold the stock of Makric to TS3. He further claimed that under the agreement the "owners" (by which he apparently meant Makric's shareholders) were liable for the "pre-closing

---

[13]The equation for computing Makric's gain is:

$$\text{gain} = \text{amount realized} - \text{adjusted basis}$$

See sec. 1001(a). After the known values are substituted into the equation, the equation becomes:

$$\$8,060,137 = \text{amount realized} - \$8,439,863$$

Rearranged, this is:

$$
\begin{aligned}
\text{amount realized} &= \$8,060,137 + \$8,439,863 \\
&= \$16,500,000
\end{aligned}
$$

[*27] taxes" (by which he apparently meant Makric's income-tax liability up to the closing date of September 30, 2008). For this proposition, O'Brien explicitly referred to Section 4.12 of the stock purchase agreement, a representation by Makric and by Makric's owners that all taxes payable by the "Company" (defined as Alpha, not Makric as O'Brien assumed) were fully paid as of the closing date of the stock purchase agreement. O'Brien's email also claimed that the liability of the "owners" for "pre-closing taxes" is "typically * * * handled through a return filed for the year up until closing." Thus, O'Brien's email was a suggestion that Makric file a return for a short year ending on September 30, 2008.

An accountant, Miles Harper of the firm Gainer, Donnelly & Desroches, prepared Makric's Form 1120, "U.S. Corporation Income Tax Return", for the short tax year April 1 to September 30, 2008 (the date of the sale). We sometimes refer to this return as Makric's "2008 short-year return". The return was a consolidated return that reported the consolidated income of Makric and Alpha.[14] As of the time Harper prepared this return, he or his firm had been preparing Makric's returns for several years. Harper was familiar with Makric's presale

---

[14]A parent company and its wholly-owned subsidiary are permitted to file a consolidated return reporting their consolidated income for the taxable year. Secs. 1.1502-2, 1.1502-76(b)(1), Income Tax Regs. They may do so even if the parent sold the subsidiary during the taxable year. Sec. 1.1502-76(b)(5), Example (1)(c), Income Tax Regs.

[*28] ownership structure and understood (a) that Makric's shareholders had no direct interest in Alpha and (b) that Alpha had been Makric's subsidiary. Harper was not directly involved in the negotiations leading to the sale of Alpha, though it was Harper who first alerted Makric's shareholders to the possibility that the initial two-step structure might not meet the shareholders' tax objectives. As Harper understood the final transaction, TS3 purchased the stock of Makric from Makric's shareholders. He did not understand that Makric had actually sold its interest in Alpha. His misunderstanding of the sale was based on conversations he had with Makric's CFO, Baudler. Harper did not read the stock purchase agreement before, or at the time of, preparing Makric's 2008 short-year return. Believing that Makric had not sold Alpha, he did not report the sale of Alpha on Makric's return. In July 2009, Harper signed Makric's 2008 short-year return. The copy of the Form 1120 in the record is signed only by Harper as the "Preparer". The space above the line for "Signature of officer" is blank. We do not know whether any of Makric's officers reviewed the form.

Harper also prepared a Form 1120X, "Amended U.S. Corporation Income Tax Return", for Makric for the same tax year. The sole purpose of filing the amended return was to claim a greater deduction for salary expenses than Makric had claimed on the original return. The amended return also did not report the sale

[*29] of Alpha.  The Form 1120X was signed by Harper as the "Preparer", but the space above the line for "Signature of officer" was blank.  We do not know if any of Makric's officers reviewed the form.

Harper also prepared the Forms 1040, "U.S. Individual Income Tax Return", for Makric's shareholders for the 2008 tax year.  On the Schedule D, "Capital Gains and Losses", attached to each return, Harper reported that Kisner, Williams, and Wilson each had a long-term capital gain from the sale of an asset described on the return as "Alpha" (even though none of them owned Alpha stock).  In calculating the amount of gain each person realized, Harper subtracted what he thought was each shareholder's respective basis in Makric from what he thought was the shareholder's share of the proceeds received.  Kisner's return stated that his basis in "Alpha" was $1,471,015 and his "sales price" for "Alpha" was $8,250,000.  Williams's return stated that his basis in "Alpha" was $1,456,343 and that his "sales price" for "Alpha" was $3,576,306.  Wilson's return stated that his basis in "Alpha" was $1 million and that his "sales price" for "Alpha" was $3,513,806.[15]  Harper would later testify that he used "Alpha" to designate Makric

_____

[15]Thus, the individual returns for Kisner, Williams, and Wilson suggest that of the $16.5 million Makric received, $15,340,112 (i.e., $8,250,000 + $3,576,306 + $3,513,806) ended up in the hands of Kisner, Williams, and Wilson.  As previously stated, we find that at least some of the $16.5 million ended up in their

(continued...)

[*30] stock because Makric was a holding company that held only Alpha stock. This testimony was credible because the bases Harper used for "Alpha" were what Harper thought were Makric's shareholders' respective bases in their Makric stock.

Kisner and Wilson reviewed their individual returns and each saw that the returns showed gain from the sale of "Alpha". (Williams did not review his individual return before he signed it.)

The IRS audited Makric's 2008 short-year return and the 2008 individual returns for Makric's shareholders. The IRS questioned why Makric did not report the sale of Alpha shares. It was at this time that Harper realized that he might have prepared the returns incorrectly.

The IRS issued the notice of deficiency to Makric on November 8, 2012. The IRS determined that Makric had a deficiency of $2,839,780 relating to its failure to report the sale of Alpha. This deficiency was based on the IRS's determination that Makric sold its Alpha stock and should have reported a gain of $8,060,137. In the notice, the IRS also determined an accuracy-related penalty of $567,960 under section 6662(a). The IRS determined that the underpayment on

---

[15](...continued)
hands. See supra p. 26. The record does not reveal the exact amount.

[*31] which the penalty was based was a large corporation underpayment under section 6621(c); such an underpayment is subject to a higher interest rate than the rate normally charged on underpayments.

This case was tried in Houston, Texas. At trial, the parties jointly introduced, and we admitted into evidence, an affidavit of Brunson, TS3's chairman. In it, Brunson swore to the following:

> TS3 purchased all of the common stock of Alpha Circuits Incorporated * * *. It was represented to TS3 that Alpha was owned by Makric * * *.
>
> In addition, it was my understanding that Messrs. Kisner, Williams and Wilson insisted upon a structure for the sale that would produce long term capital gain treatment of the proceeds for each of them for federal income tax purposes. TS3 was agreeable to such a structure and, based on Makric's and its owners' comments to the final agreement, we thought the executed agreement met their goal.
>
> It was my understanding at the time that Makric was not an operating company, that it was a pure holding company, and that its only asset was the stock of Alpha. Assuming due diligence had proven that holding company status and if the sellers had provided us with appropriate representations, warranties and indemnities regarding Makric and its lack of operations, assets and liabilities, TS3 would have been willing to purchase the stock of Makric.

On the basis of this affidavit, and on other parts of the record, we find that TS3's officers intended for TS3 to acquire the stock of Alpha through the stock purchase agreement and thought that the stock purchase agreement effected this acquisition.

**[\*32]**                                    OPINION

1.    <u>Deficiency</u>

With respect to determinations in the notice of deficiency, the taxpayer generally bears the burden of proof. Tax Ct. R. Pract. & Proc. 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). The burden of proof is satisfied by a preponderance of the evidence. <u>Estate of Gilford v. Commissioner</u>, 88 T.C. 38, 51 (1987). The taxpayer may, by introducing credible evidence and cooperating with the IRS's reasonable requests for information, shift the burden of proof to the IRS. <u>See</u> sec. 7491(a)(1); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 442 (2001). We decide this case, as it relates to the amount of the deficiency, on a preponderance of the evidence. Therefore, we need not determine who bears the burden of proof. <u>See</u> <u>Knudsen v. Commissioner</u>, 131 T.C. 185, 189 (2008).

The issue before the Court concerns the tax consequences of the transaction associated with the stock purchase agreement. The IRS contends that Makric, for federal-income-tax purposes, should be treated as if it sold the stock of Alpha to TS3. Under this view, Makric would recognize gain on the sale of Alpha stock. Makric contends that Makric's shareholders, for federal-income-tax purposes, should be treated as if they had sold Makric stock to TS3. Under this view, Makric would have no gain from the sale.

**[*33]** As described in detail below, the parties make various arguments in favor of their respective positions. These arguments involve the following legal concepts:

- Texas state-law principles of interpreting contracts,

- the Texas state-law remedy of reformation of contracts on the grounds of mutual mistake, and

- the federal tax principles of (1) substance-over-form and (2) the Danielson rule.

The relevant aspects of each of these concepts are described below.

We begin by describing Texas state-law principles of interpreting contracts. Interpreting a contract is "primarily" a matter of "ascertain[ing] the * * * intentions of the parties as expressed in the written instrument". Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). A threshold issue in contract interpretation is whether the contract is unambiguous or ambiguous. A contract is unambiguous if it is "so worded that it can be given a certain or definite legal meaning or interpretation". Id. A contract is ambiguous if "its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning, taking into consideration circumstances present when the particular writing was executed". Lenape Res. Corp. v. Tenn. Gas Pipeline Co., 925 S.W.2d 565, 574 (Tex. 1996). There are two types of contractual ambiguity: "patent" and "latent". Nat'l Union

[*34] <u>Fire Ins. Co. v. CBI Indus., Inc.</u>, 907 S.W.2d 517, 520 (Tex. 1995). "A patent ambiguity is evident on the face of the contract", <u>id.</u>, "often as the result of the use of inherently uncertain or conflicting words", 11 Williston on Contracts, sec. 33:43 (4th ed. 2015).[16] A latent ambiguity exists if the contract is plain on its face but is ambiguous in light of "some collateral matter." <u>Nat'l Union Fire Ins. Co.</u>, 907 S.W.2d at 520. The Texas Supreme Court has given the following example of a latent ambiguity: "[I]f a contract called for goods to be delivered to 'the green house on Pecan Street,' and there were in fact two green houses on the street, it would be latently ambiguous." <u>Id.</u> at n.4. The determination of whether a contract is ambiguous is a matter of law. <u>Id.</u> In making the determination, courts cannot consider extrinsic evidence of the parties' intent. <u>See</u> <u>Meridien Hotels, Inc. v. LHO Fin. P'ship I, L.P.</u>, 255 S.W.3d 807, 816 (Tex. App.--Dallas 2008). Extrinsic evidence, also known as "parol evidence", is "evidence not contained in the body of an agreement or other instrument". 36 Tex. Jur., Evidence, sec. 316. Extrinsic evidence of the parties' intent includes:

---

[16]For example, in <u>Furmanite Worldwide, Inc. v. NextCorp., Ltd.</u>, 339 S.W.3d 326, 333 (Tex. App.--Dallas 2011), one provision of a contract provided that the date of the agreement was August 31, 2006, but another provision provided that the first year of the agreement was 2003, thus making it ambiguous as to when the agreement took effect.

**[\*35]** ● "expressions of the parties simultaneous with the making of the contract", <u>Remington Rand, Inc. v. Sugarland Indus.</u>, 153 S.W.2d 477, 484 (Tex. 1941), and

● "evidence of declarations of the parties made out of court as to their intentions as to future writings (such as instructions given for drafting deeds or wills)", <u>Henry v. Powers</u>, 447 S.W.2d 738, 743 (Tex. Civ. App.--Houston [1st Dist.] 1969).

Although extrinsic evidence of the parties' intent cannot be considered in determining whether a contract is ambiguous, see <u>Nat'l Union Fire Ins. Co.</u>, 907 S.W.2d at 521; <u>Meridien Hotels</u>, 255 S.W.3d at 806, Texas courts have held that extrinsic evidence of the surrounding circumstances and the subject matter of the contract may be considered to determine whether a latent ambiguity exists, <u>Loaiza v. Loaiza</u>, 130 S.W.3d 894, 905 (Tex. App.--Fort Worth 2004) ("Although the determination of whether a contract is ambiguous should be limited to an examination of the language of the agreement, appellate courts may examine extrinsic evidence of 'surrounding circumstances' or 'the subject matter of the contract' to determine if a latent ambiguity exists." (quoting <u>Birmingham Fire Ins. Co. v. Am. Nat'l Fire Ins. Co.</u>, 947 S.W.2d 592, 603 (Tex. App.--Texarkana 1997, writ denied))).

**[\*36]** If the contract is determined to be unambiguous, it is interpreted in accordance with its provisions.  Coker, 650 S.W.2d at 393.  If a contract is determined to be ambiguous, the next step is to determine the best interpretation, i.e., which of the reasonable meanings of the ambiguous term or provision best represents the parties' intentions.  See Nat'l Union Fire Ins. Co., 907 S.W.2d at 520.  Determining the best interpretation is a matter of fact.  Coker, 650 S.W.2d at 394 ("When a contract contains an ambiguity * * * the interpretation of the instrument becomes a fact issue.").[17]  In determining the best interpretation of an ambiguous contract, extrinsic evidence of the parties' intent may be considered.  Lenape Res. Corp., 925 S.W.2d at 574 ("If the written instrument is ambiguous, the trier of fact may look to parol evidence to determine the parties' intent."); see also Grimes v. Dike, 2006 WL 1918560, at \*2 (Tex. App.--Tyler 2006) ("Parol evidence is admissible to explain both latent and patent ambiguities.").

We have referred to several rules regarding the consideration of extrinsic evidence of the parties' intent.  We summarize these rules below:

---

[17]Determining the best interpretation of an ambiguous contractual provision is sometimes referred to as "resolving" or "explaining" the ambiguity.  See, e.g., Exxon Corp. v. W. Tex. Gathering Co., 868 S.W.2d 299, 302 n.3 (Tex. 1993); Lorino v. Crawford Packing Co., 175 S.W.2d 410, 416 (Tex. 1943).

| [*37]<br><br>Type of ambiguity | Can extrinsic evidence of intent be considered to -- | |
| --- | --- | --- |
| | establish ambiguity? | resolve ambiguity? |
| Patent ambiguity | No | Yes |
| Latent ambiguity | No, but extrinsic evidence of surrounding circumstances and subject matter may be considered | Yes |

We now describe the Texas state-law remedy of reformation of contracts on the ground of mutual mistake. The remedy of reformation is an equitable remedy.[18] A suit to reform a contract can be brought in the Texas district courts, which are general-jurisdiction trial courts with both legal and equitable powers. Tex. Jur. 3d, Cancellation and Reformation, sec. 132 (1980) ("Reformation may be sought in the district court."); Dubai Petroleum Co. v. Kazi, 12 S.W.3d 71, 75 (Tex. 2000) (general jurisdiction); Texas Gov't Code sec. 24.008 (West 2004) (legal and equitable powers). Reformation can be the principal object of a suit or

---

[18]According to Howard v. Young, 210 S.W.2d 241, 243 (Tex. Civ. App.--Amarillo 1948, writ ref'd n.r.e.):

> Courts of equity have always exercised jurisdiction over mutual mistakes and granted the relief of reforming written instruments by ascertaining the intent of the parties who executed them and conforming the writing to the real contract which they intended to make. * * * The purpose of doing so is to adjust the instrument to the conditions of fact and make it effective to carry out the true purpose which the parties intended to express. * * *

**[*38]** it can be ancillary to other claims for relief. Tex. Jur. 3d, Cancellation and Reformation, sec. 132. A suit for the reformation of a contract requires joinder of all parties to the contract and all other persons who have an interest in the controversy. Beneficial Standard Life Ins. Co. v. Trinity Nat'l Bank, 763 S.W.2d 52, 56 (Tex. App.--Dallas 1988). One ground for reformation is a mutual mistake. Gilbane Bldg. Co. v. Keystone Structural Concrete, Ltd., 263 S.W.3d 291, 300-301 (Tex. App.--Houston [1st Dist.] 2007, no pet.) ("If a written contract fails to reflect a party's original agreement due to a mutual mistake, the court may reform the contract to properly reflect the party's true agreement." (citing Cherokee Water Co. v. Forderhause, 741 S.W.2d 377, 379 (Tex. 1987))). A mutual mistake "occurs where the parties to an agreement have a common intention, but the written contract does not reflect the intention of the parties due to a mutual mistake." Okon v. MBank, N.A., 706 S.W.2d 673, 675 (Tex. App.--Dallas 1986, writ ref'd n.r.e.); see also Sun Oil Co. v. Bennett, 84 S.W.2d 447, 450 (Tex. 1935) (a mutual mistake is "a mistake common to both parties"); Durham v. Luce, 140 S.W. 850, 854-855 (Tex. Civ. App.--Galveston 1911) ("[E]quity will only correct a mistake in a deed when such mistake is the mutual mistake of all the parties to the instrument[.]"). The existence of a mutual mistake can be proved by extrinsic evidence of intent. Estes v. Republic Nat'l Bank, 462 S.W.2d 273, 275 (Tex.

**[*39]** 1970) ("[P]arol evidence is admissible to show that the writing, because of a mutual mistake, incorrectly reflects the true agreement").  For mutual mistake to be proven, the evidence must be "clear, exact, and satisfactory".  Id. (quoting Sun Oil Co., 84 S.W. 2d at 452)  Finally, "facial ambiguity is not a requirement for reformation".  66 Am. Jur. 2d, Reformation of Instruments, sec. 6; see also Brinker v. Wobaco Trust, Ltd., 610 S.W.2d 160, 164 (Tex. Civ. App.--Texarkana 1980, writ ref'd n.r.e.) ("The fact that the written language is couched in unambiguous language * * * will not preclude relief by reformation.").  Thus, a contract that is clear on its face can still be reformed.

We now describe the federal tax principles implicated by the parties' arguments.  The substance-over-form doctrine is the principle that "[t]he substance of the transaction rather than the form of the agreement must determine the tax consequences to the parties."  Strutzel v. Commissioner, 60 T.C. 969, 976 (1973); see Southgate Master Fund, L.L.C. v. United States, 659 F.3d 466, 479 (5th Cir. 2011) ("The substance-over-form doctrine allows a transaction to be re-characterized so that its taxable form corresponds to its economic substance.").  The substance-over-form doctrine can be invoked by either the government or the taxpayer.  Estate of Weinert v. Commissioner, 294 F.2d 750, 755 (5th Cir. 1961), rev'g and remanding 31 T.C. 918 (1959).  However, the Court of Appeals for the

**[\*40]** Third Circuit in <u>Commissioner v. Danielson</u>, 378 F.2d 771, 775 (3d Cir. 1967), <u>vacating and remanding</u> 44 T.C. 549 (1965), held that the invocation of the substance-over-form doctrine by taxpayers is restricted in certain circumstances. <u>Danielson</u> determined the tax treatment of proceeds received by a company's shareholders in exchange for two things: (1) their stock of the company and (2) their promise that after the sale they would not compete with the company (such a promise is known as a noncompete covenant). <u>Id.</u> at 773. Their agreement with the buyer stated that 41% of the price was for the noncompete covenant and 59% was for the stock. <u>Id.</u> The shareholders contended that the entire price was in "fact" and in "business reality" a payment for the stock. <u>Id.</u> at 774. They argued that the 41%/59% allocation in the agreement should be disregarded for purposes of determining the tax consequences of their receipt of the proceeds. <u>Id.</u>[19] The Third Circuit rejected the shareholders' argument. <u>Id.</u> at 774-775, 778. The court held:

> [A] party can challenge the tax consequences of his agreement as
> construed by the Commissioner only by adducing proof which in an

---

[19]The portion of the price considered to be for the noncompete covenant would be taxed as ordinary income to the shareholder. <u>Schmitz v. Commissioner</u>, 51 T.C. 306, 313 (1968), <u>aff'd</u> <u>sub nom.</u> <u>Throndson v. Commissioner</u>, 457 F.2d 1022 (9th Cir. 1972). The portion of the price considered to be for the stock would be taxed more favorably as capital gain. Thus, it was in the shareholders' interest to argue that the price should be considered payment for the stock.

**[\*41]** action between the parties to the agreement would be admissible to alter that construction of the contract or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. \* \* \*.

Id. at 775.  The court further held that if the shareholders had attempted, in an action against the buyer, "to avoid or alter the [sales] agreement \* \* \* [they] would have a heavy burden of showing fraud, duress, undue influence and the like under what may loosely be called common-law principles", id. at 778-779, and that "examination of all the evidence adduced in this case reveals nothing to demonstrate that the contract as written was not the taxpayers' [i.e., the shareholders'] conscious agreement", id. at 779.  The rule adopted by the Third Circuit in Danielson, i.e., the "Danielson rule", CMI Int'l, Inc. v. Commissioner, 113 T.C. 1, 4 (1999), can be thought of as having both a restrictive and a permissive component.  The restrictive component prevents the taxpayer from asserting the substance-over-form doctrine.  See Commissioner v. Danielson, 378 F.2d at 775; Michael Bailiff, "When (and Where) Does the Danielson Rule Limit Taxpayers Arguing Substance over Form?", 82 J. Tax'n 362, 362 (1995) (referring to "Danielson's nondisavowel principle that binds taxpayers to the form of their transaction, regardless of its economic substance" (emphasis added)).  The permissive component recognizes that the taxpayer may rely on nontax legal

[*42] principles, such as the state-law principles regarding reformation of contracts. See CMI Int'l, Inc. v. Commissioner, 113 T.C. at 4 ("Where the terms of a transaction are set forth in a written contract, the Danielson rule provides that a party to the contract may disavow the form of such transaction only with evidence that would allow reformation of the contract (e.g., to prove fraud or duress)." (citing Commissioner v. Danielson, 378 F.2d at 775)). The Danielson rule applies to a taxpayer's argument only if the agreement in question is unambiguous. Id. ("If the contract is ambiguous, however, the Danielson rule does not apply." (citing N. Am. Rayon Corp. v. Commissioner, 12 F.3d 583, 589 (6th Cir. 1993), aff'g T.C. Memo. 1992-610)). Although Danielson was an opinion of the Third Circuit, the Fifth Circuit has applied the Danielson rule in several cases including Spector v. Commissioner, 641 F.2d 376, 386 (5th Cir. 1981), rev'g 71 T.C. 1017 (1979), Smith v. Commissioner, 65 F.3d 37, 40 n.13 (5th Cir. 1995), aff'g T.C. Memo. 1994-149, and Insilco Corp. v. United States (In re Insilco Corp.), 53 F.3d 95, 99 (5th Cir. 1995).

Having described these underlying legal principles, we now explain the arguments made by the parties in general terms. Makric puts forward "two basic theories". First, Makric contends that under the substance-over-form doctrine, the substance of the transaction in question is a sale by Makric's shareholders of

[*43] Makric stock to TS3.[20]  Second, Makric seeks the remedy of "reformation",

contending that evidence admissible under "state law" shows that "mutual mistake

existed in the drafting of documents by which the owners of Petitioner intended to

sell the stock of  Petitioner as distinguished from selling the stock of Alpha".

As to Makric's substance-over-form argument, the IRS contends that the

Danielson rule applies and that therefore we cannot consider Makric's substance-

over-form argument at all.  In addition, the IRS contends that "the substance of

[the] transaction was a sale of Alpha, not Makric."  Makric takes the position that

the Danielson rule does not apply because, in its view, the stock purchase

agreement is ambiguous.  As Makric contends:

> Absent a showing of mutual mistake, taxpayers will be bound by the
> terms of their unambiguous documents.  Danielson v. Commissioner,
> 378 F.2d 771 (3d Cir. 1967), cert. denied, 389 U.S. 858 (1967).
> However, the stock purchase agreement is replete with ambiguities, if
> not outright errors.[21]

---

[20]It argues:  "[T]he doctrine of 'substance over form' should be applied to reflect the transaction as the sale of Petitioner [i.e., Makric] to the buyer [i.e., TS3]."

[21]We note that although Makric contends the stock purchase agreement is ambiguous for the purpose of avoiding the Danielson rule, Makric does not contend that under Texas principles of contract interpretation the best interpretation of the stock purchase agreement is that the agreement is for the sale of Makric stock.

[*44] The IRS contends that the stock purchase agreement is unambiguous. As the IRS explained in its closing argument:

> [W]hat is not at all ambiguous are the parties to the stock purchase agreement * * *. The buyer: TS3. The seller: Makric, Petitioner. Company: Alpha Circuits. Owners of seller: Kisner, Williams, and Wilson. "Buyer desires to buy and seller desires to sell company." [paraphrasing stock purchase agreement]

As to Makric's reformation argument, the IRS first contends that the Tax Court is not the appropriate court to hear the argument. In its view, a reformation action "is a state law action, and they would have to seek reformation of the contract under state law." Second, the IRS contends that Makric has not proven that there was a mutual mistake about the contract. As the IRS argues:

> Petitioner [i.e., Makric] has not alleged fraud or duress in these negotiations, but there is likewise not a mutual mistake present in this case. In order to establish that a mutual mistake occurred, Petitioner must prove that both sides intended the sale to be of Makric. This Petitioner has not done.

These are the parties' contentions. We resolve these contentions as follows:

| [*45] | Holding | Part of opinion |
|---|---|---|
| | Makric's substance-over-form argument is barred by the <u>Danielson</u> rule because the stock purchase agreement, as interpreted without recourse to extrinsic evidence of intent, is unambiguously an agreement by Makric to sell Alpha stock. | 1.A |
| | Limited by the <u>Danielson</u> rule to its alternative argument that there was a mutual mistake regarding the stock purchase agreement that would justify reformation of the agreement under Texas law, Makric failed to make the requisite showing of mutual mistake (a determination taking into account extrinsic evidence of intent). | 1.B |
| | Even if Makric's substance-over-form argument was not barred by the <u>Danielson</u> rule, the evidence in the record shows that the substance of the transaction is the sale by Makric of Alpha stock. | 1.C |

A.  <u>Makric's substance-over-form argument is barred by the Danielson rule because the stock purchase agreement, as interpreted without recourse to extrinsic evidence of intent, is unambiguously an agreement by Makric to sell Alpha stock.</u>

We turn first to Makric's substance-over-form argument. Makric argues that the substance of the transaction was described in Kisner's email of February 28, 2008. This email described the transaction as the sale of Makric stock to TS3. The IRS would have us refrain from considering Makric's substance-over-form argument altogether. In the IRS's view, Makric is barred from advancing a substance-over-form argument by the <u>Danielson</u> rule. <u>See</u> <u>supra</u> pp. 39-42

[*46] (discussing Danielson rule). Makric argues that Danielson is not applicable to the instant case because the relevant portions of the stock purchase agreement are ambiguous. See Commissioner v. Danielson, 378 F.2d at 775. Danielson is not applicable where the underlying agreement is ambiguous. CMI Int'l, Inc. v. Commissioner, 113 T.C. at 4. Makric argues that the stock purchase agreement is ambiguous with respect to who was selling (i.e., whether it was Makric or Makric's shareholders) and the stock being sold (i.e., whether it was the stock of Makric or Alpha). Makric asserts that the agreement is both patently and latently ambiguous.

First, Makric contends that there is a patent ambiguity in the agreement in that Makric's shareholders were parties to the agreement and that this suggests (according to Makric) that the agreement called for the sale of Makric shares, not Alpha shares. Makric's reasoning ignores unambiguous terms of the stock purchase agreement. Although Makric's shareholders were parties to the stock purchase agreement, the agreement does not require them to sell their shares of Makric. Instead, the agreement unambiguously requires Makric to sell its shares of Alpha. It provides that "Seller [i.e., Makric] agrees to sell to Buyer [i.e., TS3], and Buyer agrees to purchase from Seller, all of the issued and outstanding shares * * * of common stock * * * of the Company [defined as Alpha]". The only

[*47] reasonable interpretation of this sentence is that Makric was to sell its Alpha stock to TS3. The inclusion of Makric's shareholders as parties to the stock purchase agreement does nothing to diminish this interpretation of the agreement. Section 3 of the stock purchase agreement, entitled "Representations and Warranties of Seller and Owners", provides: "Seller [i.e., Makric] and each Owner [i.e., Makric's shareholders] represent and warrant jointly and severally with respect to warranties covering Seller [i.e., Makric]". By this wording (and similar wording in Section 4 of the stock purchase agreement), Makric's shareholders were presumably made liable to TS3 should certain warranties made in the stock purchase agreement be found false. It is not surprising that Makric's shareholders would be required to sign an agreement that would impose such liability on them. Ordinarily, only a party that executes a contract is liable for breaching the contract. See Willis v. Donnelly, 199 S.W.3d 262, 271 (Tex. 2006) (a shareholder who does not sign a contract entered into by a corporation is ordinarily not liable for breach of such contract). If the reason for including Makric's shareholders as parties to the stock purchase agreement was instead to impose on them an obligation to sell their Makric stock, one would expect the agreement to have a provision requiring them to sell their stock. But there is no such provision. Including Makric's shareholders as parties to the stock purchase

[*48] agreement does not create ambiguity as to who was the seller (Makric) or what stock was being sold (Alpha stock).

Second, Makric contends that there is latent ambiguity that is not readily apparent on the face of the stock purchase agreement but that becomes apparent upon review of collateral documents, including correspondence and tax returns of Makric's shareholders. As discussed supra pp. 33-35, latent ambiguity exists if the contract is plain on its face but is ambiguous in the light of some collateral matter. See Nat'l Union Fire Ins. Co., 907 S.W.2d at 520-522. Under Texas law, a court may consider extrinsic evidence to determine whether a latent ambiguity exists only if that evidence concerns the surrounding circumstances or the subject matter of the agreement.[22] See id. This is the type of extrinsic evidence that can be relied on by Makric to show the stock purchase agreement is latently

---

[22]Citing Estate of Craft v. Commissioner, 68 T.C. 249 (1977), aff'd, 608 F.2d 240 (5th Cir. 1979), Makric contends that the rule against extrinsic evidence of the parties' intent should not be invoked by someone who, like the IRS, was not a party to the original transaction. Makric's argument rests on a misunderstanding of our holding in Estate of Craft. Estate of Craft did not hold that the IRS can never invoke the rule against extrinsic evidence of the parties' intent but, rather, that the decision to exclude such evidence turns on state law. Id. at 264. Specifically, Estate of Craft stated that "in those instances where we are called upon to make a State law determination as to the existence and extent of legal rights and interests created by a written instrument, we must look to that state's parol-evidence rule in deciding whether or not to exclude extrinsic evidence". Id. at 263. Estate of Craft, applying the relevant state rule, held that the taxpayer could not introduce extrinsic evidence. Id. at 264.

[*49] ambiguous.  See Loaiza, 130 S.W.3d at 905.  However, the extrinsic evidence relied on by Makric to show the stock purchase agreement is ambiguous consists only of expressions of the parties and declarations of intentions as to future writings.  See Henry v. Powers, 447 S.W.2d at 743; Remington Rand, Inc., 153 S.W.2d at 484.  Specifically the extrinsic evidence relied on by Makric is:  (1) the February 28, 2008 email from Kisner to Ronn stating that the transaction would be structured as the sale of Makric, (2) the January 27, 2009 email from O'Brien of Gulf Star (Makric's investment bank) characterizing the sale as that of Makric, (3) testimony of Makric's CEO, Kisner, that he reached an agreement with representatives of TS3, under which TS3 would buy Makric stock, and (4) Makric's shareholders' tax returns reporting a gain from the sale of Makric stock (though described on the returns as "Alpha" stock).  Under Texas law, this extrinsic evidence may not be considered.[23]  We therefore hold that the relevant portions of the stock purchase agreement are not latently ambiguous.[24]  We reject

_____

[23]As explained infra pp. 52-56, we do consider extrinsic evidence of intent to evaluate Makric's other legal theory that the stock purchase agreement was the result of mutual mistake and can be reformed on that basis.

[24]Even if we consider the extrinsic evidence proffered by Makric for the purpose of determining whether the stock purchase agreement is ambiguous, this evidence, in our view, does not lead to the conclusion that the stock purchase agreement is ambiguous.  See Commissioner v. Danielson, 378 F.2d at 779

(continued...)

**[\*50]** Makric's attempt to oppose the application of the <u>Danielson</u> rule on grounds of contractual ambiguity, patent or latent.

Makric raises several other arguments as to why the <u>Danielson</u> rule should not apply. It argues that we should hold that the <u>Danielson</u> rule applies only to agreements concerning the allocation of monetary consideration. The Court of Federal Claims followed this approach in <u>Hartman v. United States</u>, 99 Fed. Cl. 168, 181-182 (2011), <u>aff'd on other grounds</u>, 694 F.3d 96 (Fed. Cir. 2012). However, we look to our own precedent and to the law of the U.S. Court of Appeals for the circuit in which appeal of the case would lie.[25] Here that circuit is the Fifth Circuit. <u>See</u> <u>supra</u> note 2. The Fifth Circuit has not limited the <u>Danielson</u> rule to the allocation of monetary consideration. <u>See</u> <u>Spector v. Commissioner</u>, 641 F.2d 376 (holding taxpayer to the tax consequences of the form of a partnership-exit agreement which structured the partner's exit as a

---

[24](...continued)
(holding that the IRS was permitted to invoke the parol-evidence rule to exclude certain evidence in that case and further holding that even if the IRS was barred from invoking the parol-evidence rule, and the court could consider the evidence in question, the additional evidence would not change the outcome of the dispute).

[25]In <u>Golsen v. Commissioner</u>, 54 T.C. 742, 756-757 (1970), <u>aff'd</u>, 445 F.2d 985 (10th Cir. 1971), we held that we will follow the precedent of the U.S. Court of Appeals for the circuit that will hear the appeal from the case (if the case is appealed).

[*51] liquidation of his interest, and rejecting taxpayer's argument that in substance he had sold his partnership interest).

Makric next advances the argument that the Danielson rule should not apply because no unjust result would attend if TS3 were treated as having bought Makric rather than Alpha. We disagree with that argument. On the basis of the stock purchase agreement, TS3 reasonably expected that it would be treated for tax purposes as if it had purchased the stock of Alpha. See Commissioner v. Danielson, 378 F.2d at 775.

Finally, Makric contends that the Danielson rule should not apply because TS3 did not "specifically negotiate for" the sale of Alpha (as opposed to Makric).[26] Even if we were to accept that Makric could avoid application of the Danielson rule for this reason, we find untenable the position that TS3 did not believe it was negotiating for the purchase of Alpha. TS3's lawyers drafted the stock purchase agreement and its prior versions, all of which contemplated TS3's purchasing Alpha. The affidavit from TS3's Chairman, Brunson, makes clear that he believed TS3 was agreeing to purchase Alpha specifically, not Makric. If TS3 had

---

[26]Makric contends that the Fifth Circuit applied the Danielson rule in Spector v. Commissioner, 641 F.2d 376 (5th Cir. 1981), rev'g 71 T.C. 1017 (1979), and Insilco Corp. v. United States (In re Insilco Corp.), 53 F.3d 95 (5th Cir. 1995), only because in those cases "the taxpayer was trying to change a provision that it had specifically negotiated with the other party."

[*52] purchased Makric, TS3 would have been indirectly burdened with all of Makric's liabilities, not just Alpha's liabilities. Makric's liabilities would have included Makric's potential tax liability if it were to sell Alpha. If TS3 had negotiated for the sale of Makric, rather than Alpha, it might have negotiated a reduced price to account for the burden of Makric's liabilities.

We hold that the <u>Danielson</u> rule bars Makric from contending that in substance the stock purchase agreement is for the sale of Makric.

B. <u>Limited by the Danielson rule to its alternative argument that there was a mutual mistake regarding the stock purchase agreement that would justify reformation of the agreement under Texas law, Makric failed to make the requisite showing of mutual mistake (a determination taking into account extrinsic evidence of intent)</u>.

Even when a taxpayer is restricted by the <u>Danielson</u> rule, a court may reform an agreement if the relevant portions of the agreement were the result of a mutual mistake. See <u>Commissioner v. Danielson</u>, 378 F.2d at 775. Makric contends that the relevant portions of the stock purchase agreement (i.e., those identifying the seller as Makric and the stock to be transferred as the stock of Alpha) were the result of a mutual mistake. A mutual mistake is one common to all parties, wherein each labors under the same misconception about a material fact, the terms of the agreement, or the provisions of a written instrument designed to embody such an agreement. <u>Hardy v. Bennefield</u>, 368 S.W.3d 643, 650 (Tex.

[*53] App.--Tyler 2012).  The question of what the parties intended (and therefore whether there was a mutual mistake) is a factual issue.  See Milner v. Milner, 361 S.W.3d 615, 619 (Tex. 2012).  In determining whether there was a mutual mistake, extrinsic evidence is considered.  Estes v. Republic Nat'l Bank of Dallas, 462 S.W.2d 273, 275 (Tex. 1970).  A mutual mistake justifies reforming even an unambiguous contract.  Brinker, 610 S.W.2d at 164.

In support of its theory that the stock purchase agreement, in failing to effect a sale of Makric stock, resulted from mutual mistake, Makric proffers two principal pieces of evidence.  First, Makric points to Kisner's email instructing Ronn, TS3's lawyer, to structure the transaction so that TS3 would purchase Makric, not Alpha.  See supra p. 14.  Second, Makric points to the testimony of its president, Kisner, who was the lead negotiator for Makric.  Kisner testified that he reached an agreement with a representative of TS3 (presumably Brunson, TS3's chairman and lead negotiator) that Makric's shareholders would sell Makric to TS3.  Both pieces of evidence could, if considered credible, tend to show that the parties intended to sell Makric and that therefore the stock purchase agreement, which effected the sale of Alpha, was the result of mutual mistake.  We thus consider this evidence.

[*54] We are unable to conclude that the two pieces of evidence described above show that the pertinent portions of the stock purchase agreement were the result of a mutual mistake. We consider first the email sent from Kisner to Ronn on February 28, 2008. Kisner's email shows that he intended, at one time, to structure the transaction as the sale of Makric. And, as we have found, a representative from TS3, at some time before the February 28, 2008 email, had assented to that structure. See supra note 8. However, Kisner sent the email to Ronn seven months before the parties executed the stock purchase agreement. Over the course of those seven months, Kisner (with Miller, Makric's lawyer) reviewed several drafts of the stock purchase agreement, all of which contradict the premise that the parties intended to exchange Makric stock, rather than Alpha stock. Critically, the stock purchase agreement itself and several of its drafts describe a sale structure by which TS3 would acquire Alpha, not Makric. Additional documents, including those signed prior to the closing and at the closing itself, are consistent with the premise that TS3 intended to acquire, and Makric intended to sell, Alpha. For example, in 2007, Makric's shareholders (in their capacities as Alpha's directors) signed a consent authorizing that Alpha be listed for sale. See supra p. 7. The record contains no comparable document listing Makric for sale. Makric's shareholders (in their capacities both as directors

[*55] and shareholders of Makric) also signed a "Joint Written Consent of the Shareholders and Directors in Lieu of a Special Meeting", which unambiguously authorized the sale of Alpha by Makric. See supra pp. 20-21. At the closing, Kisner, in his capacity as CEO of Makric, signed a "Written Consent of Sole Shareholder of Alpha Circuits Incorporated", which also unambiguously authorized the sale of Alpha by Makric. See supra p. 21. We consider these documents more probative of the parties' intent at the time they executed the stock purchase agreement than Kisner's single email, which he sent several months before the transaction occurred. Other than the email, the only evidence that supports the premise that TS3 intended to purchase Makric is Kisner's testimony. He testified that he and representatives of TS3 orally agreed to restructure the sale such that TS3 would purchase Makric. He further testified that he emailed Ronn only to put that agreement in writing. While we consider Kisner's testimony credible and find it plausible that each side's negotiators, at some point, approved the structure described by Kisner's February 28, 2008 email, the weight of the evidence, including the transactional documents (i.e., the stock purchase agreement and the consent forms executed at the closing of the sale), indicates that Makric and TS3 had agreed to a different structure by the time they executed the stock purchase agreement. For these reasons, even if we were to conclude that the

[*56] extrinsic evidence proffered by Makric shows that Makric and TS3 may have, at one point, reached an agreement to sell Makric, this evidence is insufficient to show that the relevant portions of the stock purchase agreement were the result of a mutual mistake.

The record does not reveal why the parties did not ultimately adopt the structure Kisner described in his email to Ronn (TS3's lawyer). The persons who, presumably, could have explained this discrepancy were Ronn (TS3's lawyer who prepared the stock purchase agreement and its drafts) and Miller (Makric's lawyer). Makric did not call either lawyer as a witness. Regardless, the record makes clear that the parties to the stock purchase agreement did not ultimately adopt the structure described in Kisner's email. Brunson, TS3's chairman, stated in his affidavit (see supra pp. 30-31) that TS3 might have been willing to purchase Makric had TS3 undertaken the requisite steps, including an appropriate due-diligence inquiry, for such a purchase; however, the affidavit also implies that the parties did not take such steps.[27] Brunson swore: "Assuming due diligence had proven that holding company status [of Makric] and if the sellers had provided us

---

[27]We found that TS3 started a due-diligence inquiry with respect to Makric. See supra p. 16. However, we know very little about the inquiry. It is plausible that TS3 would have more thoroughly investigated Makric had TS3 intended to buy Makric rather than Alpha.

[*57] with appropriate representations, warranties, and indemnities regarding Makric * * * TS3 would have been willing to purchase the stock of Makric." (emphasis added). Such due diligence might have revealed that Makric had liabilities that TS3 did not wish to assume or which would have required an adjustment to the amount that TS3 was willing to pay for Makric. Brunson's admission that TS3 never conducted the requisite due diligence indicates that TS3 never seriously contemplated purchasing Makric.[28] Moreover, even if TS3 had been amenable to purchasing Makric (as the affidavit suggests), neither the ultimate transaction, nor the negotiations leading up to it, indicate that TS3 intended to purchase Makric at the time the parties reached a final agreement about the sale.

Makric advances numerous additional theories as to why Makric's shareholders could not have possibly intended to authorize the sale of Alpha. For example, Makric argues that, since Makric's shareholders owned Makric stock, it is only natural that they would have intended to sell Makric stock. This argument, however, is contradicted by the fact that Makric originally planned to dissolve and

---

[28]It is also possible that TS3 would have paid less for Makric (than it did for Alpha) because Makric would have had a potential tax liability (attributable to Makric's built-in gain from its holding of Alpha stock) if it were to sell Alpha after having been acquired by TS3. See supra p. 51.

[*58] distribute its Alpha stock to Kisner, Williams, and Wilson. Thus, as they originally envisioned the transaction, Makric's shareholders would have held and sold Alpha stock to TS3. We reject the proposition that Makric's shareholders could have only intended a transaction in which they would sell their Makric stock. Even if this proposition were true, it could show only that Makric was mistaken about the contents of the stock purchase agreement. It says nothing about TS3's intent, which was to purchase Alpha.

Makric contends that the parties to the stock purchase agreement would have agreed to the sale of Alpha only by mistake because the sale of Alpha was a tax-inefficient way to structure the sale and because TS3 knew that Makric wanted to structure the sale so that the gain from the sale would produce long-term capital gain. We agree that structuring the transaction as the sale of Alpha may have been relatively tax-inefficient. The tax consequences to Makric for selling Alpha stock can be found in the notice of deficiency issued to Makric. The notice of deficiency calculates that Makric's tax liability increased $2,839,780 by its sale of Alpha. Makric does not contest the correctness of this amount should the Court determine that the transaction is treated as the sale of Alpha.[29] By contrast, if the

[29] Arguably $2,839,780 is not the only tax liability resulting from the sale of Alpha. Makric's shareholders appear to face a second layer of tax because they

(continued...)

[*59] transaction is treated as the sale of Makric shares, the tax consequences--at least as reported by Makric's shareholders (Kisner, Williams, and Wilson)--are found on their individual tax returns. The shareholders reported that they should be taxed on the gain from the sale of their Makric stock at the 15% tax rate imposed on net long-term capital gain. See secs. 1(h), 1001, 1222.[30] Using this rate appears to result in an increased tax to the shareholders of only $1,711,913. This is less than $2,839,780. The comparison between the two numbers may illustrate the arguable tax inefficiency of selling Alpha rather than Makric. The problem with Makric's tax-efficiency argument is that it conceivably sheds light only on Makric's intent in signing the stock purchase agreement. TS3, by contrast, thought that the form of the agreement it signed met the goals of Makric's shareholders. In his affidavit, see supra pp. 30-31, Brunson stated that

---

[29](...continued)
received at least some of the proceeds from this sale. Their receipt of proceeds could be considered a constructive distribution from Makric. See generally secs. 301, 316 (corporate distributions to shareholders); United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969) (constructive distribution to shareholders treated as actual distribution). A distribution (constructive or actual) may be taxed as ordinary income, capital gain, a tax-free return of capital, or a combination of all three. See sec. 306(c)(1), (2), and (3).

[30]Net long-term capital gain equals long-term capital gains minus long-term capital losses. Sec. 1222(7). A long-term capital gain is gain from the sale or exchange of a capital asset held for more than one year. Sec. 1222(3).

**[*60]** he believed that the "structure for the sale would produce long term capital gain treatment of the proceeds for each of them [i.e., each of Makric's shareholders] for federal income tax purposes." If TS3 was wrong about this,[31] that meant that TS3 made a mistake about the tax consequences of the agreement. A mistake concerning the legal or tax consequences of an agreement is not the type of mistake that reformation can remedy. See Hamlin's Trust v. Commissioner, 209 F.2d 761, 765 (10th Cir. 1954), aff'g 19 T.C. 718 (1953); M. Weingold & Co. v. Commissioner, T.C. Memo. 1977-73, 36 T.C.M. (CCH) 329, 335 (1977); Marsh v. Marsh, 949 S.W.2d 734, 745 (Tex. App.--Houston [14th Dist.] 1997).

The IRS argues that this Court is not the proper court for Makric to seek reformation of the stock purchase agreement. We need not address this contention because, for reasons already explained, Makric has not shown that the relevant

---

[31]This belief may have been incorrect. The sale of Alpha did produce long-term capital gain, as Brunson said. Makric must recognize capital gain on the sale of Alpha. Its resulting tax liability would be economically borne by Makric's shareholders. However, Makric's shareholders received some of the proceeds of the sale of Alpha by Makric. Therefore, they may be considered to have received a constructive distribution from Makric. See supra note 29. The individual shareholders arguably face their own tax liability from the constructive distribution, in addition to the capital gain that Makric must recognize.

[*61] portions of the stock purchase agreement were the result of mutual

mistake.[32] Makric has not advanced any other theory by which reformation is

justified. Thus, we conclude that the 2008 agreement should not be reformed to be

the sale of Makric stock.

      C.      <u>Even if Makric's substance-over-form argument was not barred by the Danielson rule, the evidence in the record shows that the substance of the transaction is the sale by Makric of Alpha stock</u>.

Even if the merits of Makric's substance-over-form argument should be

reached, despite the <u>Danielson</u> rule, the argument lacks merit. Makric argues that

the transaction was, in substance, the sale of Makric because Makric's

shareholders intended to sell Makric. This premise would not give us a basis for

concluding that the substance of the transaction was the sale of Makric. Under the

substance-over-form doctrine, the tax consequences of a transaction are not

---

[32]The IRS's contention implicates <u>Deshotels v. United States</u>, 450 F.2d 961, 967 (5th Cir. 1971), in which the Fifth Circuit held that an unambiguous contract cannot be reformed where a party to the contract offers only extrinsic evidence to reform the contract and the other party to the contract is not a party to the case. <u>See also</u> <u>State Pipe & Nipple Corp. v. Commissioner</u>, T.C. Memo. 1983-339, 46 T.C.M. (CCH) 414, 415 (1983). <u>Deshotels</u> appears to be relevant to this case because (1) Makric offers only extrinsic evidence (an email and testimony) to prove mutual mistake about the stock purchase agreement, (2) the agreement is unambiguous, and (3) the other party to the stock purchase agreement (TS3) is not a party to this case. In our view, <u>Deshotels</u> serves as an alternative ground for our holding that Makric has made an insufficient showing that a finding of a mutual mistake is warranted.

[*62] necessarily governed by the intent of a party to that transaction. See PPL Corp. v. Commissioner, 569 U.S. __, __, 133 S. Ct. 1897, 1905 (2013); Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). Here, the stock purchase agreement and the circumstances surrounding its execution make plain that the transaction was both in form and substance the sale of Alpha by Makric. The relevant portions of the stock purchase agreement (i.e., the portions identifying the seller and the stock that would be transferred) were not mere recitals, but were the very substance of the underlying sale. See generally Mittleman v. Commissioner, 56 T.C. 171, 175-177 (1971), aff'd, 464 F.2d 1393 (3d Cir. 1972). Specifically, the parties agreed to the following: "Seller [defined as Makric] agrees to sell to Buyer [defined as TS3], and Buyer agrees to purchase from Seller, all of the issued and outstanding shares (the 'Shares') of common stock * * * of the Company [defined as Alpha]". Makric has not invited our attention to any provision in the stock purchase agreement that is inconsistent with this statement, nor are we aware of any such provision. Upon execution of the stock purchase agreement, Makric transferred Alpha stock to TS3, and Makric's shareholders continued to own Makric. Accordingly, we conclude that the transaction was, both in form and in substance, the sale of Alpha stock by Makric.

[*63] Makric emphasizes that both Makric and TS3 were amenable to structuring the transaction as a sale of Makric. Makric points to the affidavit from TS3's Chairman, Brunson, which stated that: (1) TS3 was aware that Makric's shareholders were trying to achieve a particular tax result, (2) TS3 would have accommodated a sale structure that would have achieved that tax result, and (3) he believed the sale was structured in a way that achieved that tax result. This affidavit, however, does no more than show that the sale could have been structured differently had the parties negotiated for and agreed to a different structure. It does not alter the terms or substance of the agreement that the parties in fact reached, the purchase of Alpha by TS3. See Pittsburgh Realty Inv. Trust v. Commissioner, 67 T.C. 260, 275 (1976).[33]

2.    Penalty

The IRS determined that Makric is liable for an accuracy-related penalty under section 6662. Section 6662(a) and (b)(2) imposes a penalty equal to 20% of an underpayment of tax that is attributable to a substantial understatement of income tax. An understatement is defined as the excess of the correct amount of tax over the amount of the tax which is shown on the return. Sec. 6662(d)(2)(A).

---

[33]Our holding in part 1.C, that the substance of transaction was the sale of Alpha stock by Makric, is an alternative to our main holding in part 1.A that Makric is barred from asserting the substance-over-form doctrine.

**[\*64]** In the case of a corporation, an understatement is substantial if (1) it exceeds 10% of the correct tax and (2) it exceeds $10,000. Sec. 6662(d)(1)(B).

Under section 7491(c), the IRS bears the burden of production with respect to the section-6662(a) penalty. This means that the IRS "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." See Higbee v. Commissioner, 116 T.C. at 446. The IRS has met that burden. The understatement is equal to $2,839,780, which is $3,476,671 (the correct amount of tax) minus $636,891 (the tax shown on the return). The understatement, $2,839,780, exceeds $10,000. It also exceeds 10% of the correct amount of tax (i.e., 10% of $3,476,671, or $347,667). Makric's understatement is thus substantial. See sec. 6662(d)(1)(B).

Even if an understatement is substantial, the section-6662 penalty is not imposed on any portion of the underpayment with respect to which the taxpayer acted with reasonable cause and in good faith.[34] Sec. 6664(c)(1). The taxpayer has the burden of showing that it acted with reasonable cause and in good faith. Higbee v. Commissioner, 116 T.C. at 449. Reasonable cause requires the taxpayer to have exercised ordinary business care and prudence as to the disputed item--in

---

[34]As the notice of deficiency determined, the amount of the underpayment in this case is $2,839,780, the same as the amount of the understatement.

**[\*65]** this case, gain from the sale of Alpha.  See generally United States v. Boyle,

469 U.S. 241 (1985); Gould v. Commissioner, 139 T.C. 418, 459 (2012), aff'd,

552 F. App'x 250 (4th Cir. 2014).

The most important factor in determining good faith is the extent of the

taxpayer's effort to report the correct amount of tax on the return.[35]  A taxpayer

may demonstrate good faith if it reasonably relied on the advice of a tax adviser.

Sec. 1.6664-4(b)(1), Income Tax Regs.  To reasonably rely on the advice of a tax

adviser, however, the taxpayer must take reasonable steps to ensure that the tax

adviser has all of the relevant facts.[36]  A taxpayer that prepares its returns without

relying on the advice of a tax adviser can also demonstrate that its tax reporting

was in good faith, provided, however, that the taxpayer reasonably ensured that it

used correct information to prepare its return.[37]  Thus, whether a taxpayer relies on

---

[35]The relevant regulation provides:  "Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Sec. 1.6664-4(b)(1), Income Tax Regs.

[36]The regulation provides:  "For example, the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true, such as an inaccurate representation or assumption".  Sec. 1.6664-4(c)(1)(ii), Income Tax Regs.; see also Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000) (taxpayer must provide necessary and accurate information to the adviser), aff'd, 299 F.3d 221 (3d Cir. 2002).

[37]The relevant regulation provides:  "Circumstances that may indicate

(continued...)

[*66] a tax adviser or not, the taxpayer must reasonably ensure that its return is based on correct factual assumptions.

Makric contends that its failure to report its gain on the sale of Alpha on its 2008 short-year return was in good faith because it relied on Harper to prepare the return. Harper prepared Makric's tax return for its short year 2008. The return did not report gain from the sale of Alpha. This reporting is correct only if one assumes that Makric did not sell Alpha. Setting aside the question of whether Harper gave "advice" to Makric,[38] one issue with Makric's alleged reliance on Harper relates to the source of Harper's assumption that Makric did not sell Alpha.

---

[37](...continued)
reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Sec. 1.6664-4(b)(1), Income Tax Regs. The regulation gives the following example of an honest misunderstanding: "[R]eliance on erroneous information * * * inadvertently included in data compiled by the various divisions of a multidivisional corporation or in financial books and records prepared by those divisions generally indicates reasonable cause and good faith, provided the corporation employed internal controls and procedures, reasonable under the circumstances, that were designed to identity such factual errors." Id.

[38]Harper did not give formal advice to Makric. He only prepared Makric's return. Therefore one might question whether Harper provided "advice" to Makric. See sec. 1.6664-4(c)(2), Income Tax Regs. (defining advice for this purpose as a communication setting forth the "analysis" and "conclusion" of the professional tax adviser).

[*67] Harper was told that this assumption was correct by Baudler, Makric's CFO. The question we resolve, therefore, is whether Baudler took reasonable steps to determine whether this assumption was correct.

On the record, we are not persuaded that Baudler took reasonable steps to determine whether Makric had sold Alpha. Baudler was informed by an erroneous email from O'Brien, one of Makric's investment bankers, that the final agreement was for the sale of Makric, not Alpha. We do not know whether Baudler relied on O'Brien's email to come to his conclusion that Makric sold Alpha. Even if he did, we cannot say it was reasonable to do so.[39] Perhaps Baudler should have read the agreement himself or consulted a lawyer such as Miller. Another fact one might consider is that Kisner, Makric's CEO, thought that the stock purchase agreement was for the sale of Makric (just as O'Brien thought). However, nothing shows that Baudler relied on Kisner's misunderstanding of the stock purchase agreement in concluding that Makric had not sold Alpha. Even if Baudler had relied on Kisner, we would not conclude that it was reasonable to so. Kisner was Makric's CEO, not Makric's lawyer. Makric's lawyer was Miller. It was Miller whom one would

---

[39]The record reveals nothing about O'Brien's capabilities and experience or what Baudler knew about them.

[*68] expect to be in a position to understand the stock purchase agreement.[40]

Kisner testified that Miller did not tell him that the stock purchase agreement provided for the sale of Alpha; however, the record is silent as to what Miller affirmatively told Kisner or Baudler in regard to the agreement. Thus, we cannot conclude that Baudler took reasonable steps to determine whether Makric had sold Alpha before he told Harper that Makric had not sold Alpha.

Upon review of the record, we conclude that Makric has not shown that the underpayment was the result of good faith and reasonable cause.

In reaching our conclusions, we have considered all arguments made by the parties, and to the extent that we have not addressed them, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[40]Miller was largely absent during the later stages of the negotiations between Makric and TS3 because he was injured in a car accident a few months before the closing of the sale. His firm apparently remained involved in the negotiations while he was absent, although the extent of its involvement is unclear. Miller did review the stock purchase agreement and the drafts that immediately preceded it (all of which called for the sale of Alpha to TS3). Neither Miller nor anyone from his firm was called as a witness.